**The CONNECTICUT NATIONAL BANK, Trustee, Plaintiff,**

v.

**TRANS WORLD AIRLINES, INC., Defendant.**

**No. 91 Civ. 2066 (GLG).**

United States District Court, S.D. New York.

April 29, 1991.

Camhy Karlinsky & Stein, New York City (Martin E. Karlinsky, of counsel), Shipman & Goodwin, Hartford, Conn. (Peter W. Benner, Jeffrey Hellman, of counsel), for plaintiff.

Jones, Day, Reavis & Pogue, New York City (Jane A. Rue, Michael J. Templeton, of counsel), for defendant.

### OPINION

GOETTEL, District Judge:

Before us is a matter of significance as its resolution may force yet another of America's airlines into bankruptcy. The facts presented are uncontroverted and can be summarized as follows. In February 1986, defendant Trans World Airlines, Inc. ("TWA") entered into an Equipment Trust Agreement (the "Agreement") with plaintiff The Connecticut National Bank ("CNB"). The Agreement is what is commonly known as a Sale/Leaseback. Sim-

ply, it provided that the Bank would purchase ten aircraft and approximately ninety-six jet engines from TWA, and would then lease them back to TWA until February 1, 1996.[1] In connection with the lease/purchase, plaintiff received Senior Secured Trust Notes (the "Notes"), some of which matured on February 1, 1991, and others of which were scheduled to mature on February 1, 1996. The aggregate original principal amount of these Notes was approximately $312 million, with the principal on the 1991 Notes being worth $100 million and the balance being covered by the 1996 Notes. The Agreement provided that TWA would pay all the necessary interest and principal on the Notes directly to CNB, as trustee, which in turn would pay the noteholders, who are the trust beneficiaries. TWA also guaranteed payment to the beneficiaries and agreed to indemnify CNB. Finally, the Agreement stated that once the lease expired and the Notes were paid off, the equipment would revert back to TWA.

It appears that TWA met its obligations in a satisfactory fashion until January 31, 1991. At that time, however, TWA failed to make required payments of approximately $57 million, nine million of which represented interest on the 1991 and 1996 Notes, and the other 48 million of which represented the remaining principal on the then-matured 1991 Notes. Consequently, CNB failed to pay the beneficiaries since the Agreement specifically provided that CNB was only obligated to pay the beneficiaries to the extent it was paid by TWA. CNB then demanded return of its property, as well as immediate payment of the approximately $81 million that was then due as principal on the 1996 Notes. The Agreement specifically afforded CNB these remedies. TWA failed to make any payments and did not return any of CNB's property.

CNB then filed the instant action on March 26, 1991. The complaint seeks specific performance of the Agreement's de-fault remedies, including return of the equipment located inside and outside of this country, delivery of various records relating to the property, and a permanent injunction preventing TWA from removing any of the property from the United States. On April 2, before any discovery had been conducted, plaintiff filed the instant motion for summary judgment and oral argument was heard on April 24.[2] CNB contends that since it owns the property and was merely leasing it to TWA, once TWA defaulted CNB was entitled to utilize the Agreement's provisions permitting it to reclaim the property. CNB emphasizes that it owns the property, as trustee, notwithstanding the fact that the property might ultimately have reverted back to TWA if the Agreement had been fully performed.

The well established standards for granting a motion for summary judgment require the moving party to establish the absence of a genuine issue of material fact and that it is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). In turn, the non-moving party has the burden of setting forth specific facts establishing a genuine issue for trial. Fed.R.Civ.P. 56(e). For the reasons which follow, we find that CNB has met its burden and that TWA's arguments to the contrary are simply unavailing.

Before addressing TWA's specific claims, we will mention the facts it concedes. TWA does not contest its failure to make the interest and principal payments it was required to make on January 31. Similarly, it does not challenge CNB's right to sue for enforcement of the Agreement's provisions, which provide, *inter alia,* that in the event of a default, CNB may "enter upon the premises of [TWA] or of any sublessee where any part or the whole of the Equipment may be and take possession of any part or the whole of the Equipment and withdraw the same from said premises." Agreement § 7.02. Nor does it dispute that it refused the trustee's demand for

---

**1.** At oral argument, we were told that approximately sixty-two of the engines are presently available for planes in addition to the ten in question. It is not clear how many planes are utilizing the sixty-two engines and how many are simply held in reserve.

**2.** TWA joined issue on April 15.

such access and possession. Instead, TWA offers a number of procedural arguments in opposition to CNB's motion.

■ TWA's first contention is that it has not been afforded an adequate opportunity to conduct discovery and, therefore, we should not yet address the merits of this dispute. We recognize that barely a month has passed since the filing of the complaint and that no discovery has been conducted. In addition, we acknowledge that courts generally are reluctant to grant summary judgment when the non-moving party has not had an adequate opportunity for discovery. This by no means is a prohibition on the entry of judgment at this stage. As the Second Circuit Court of Appeals has recognized, the opposing party must submit an affidavit explaining, *inter alia*, the facts that are sought, how they are to be obtained and, perhaps most importantly, how these facts are expected to create a genuine issue of material fact. *See Hudson River Sloop Clearwater, Inc. v. Department of the Navy*, 891 F.2d 414, 422 (2d Cir.1989). TWA has not met this burden. With one exception, TWA has not suggested any additional evidence that it needs to obtain, but instead, simply suggests that it is too soon to entertain a summary judgment motion, especially on a matter as important as this one. That is insufficient.

The only specific issue upon which TWA seeks discovery is the question of whether CNB is merely a " 'naked trustee[ ]' [acting] as [a] 'mere conduit[ ]' for a remedy flowing to others." *Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 465, 100 S.Ct. 1779, 1784, 64 L.Ed.2d 425 (1980) (citations omitted). TWA claims that if CNB is not suing on its own behalf, but rather, is merely a "naked trustee" seeking to protect the trust beneficiaries, it may not be the real party in interest. Thus, the beneficiaries would be deemed the real parties in interest and, since some beneficiaries are not diverse

from TWA, we may actually lack subject matter jurisdiction.

■ Unfortunately for TWA, there is absolutely no merit to the claim that CNB is a "naked trustee" and further discovery will not change this conclusion. First, CNB owns the property in question and, therefore, has an obvious interest in seeking its return, notwithstanding the fact that TWA has both guaranteed payment to the beneficiaries and agreed to indemnify CNB. The remedy CNB seeks was specifically provided for in the Agreement. In addition, the *Navarro Savings* Court referred to a trustee acting as a conduit "for a remedy flowing to others." *Id.* Here, the only party that can seek return of the property is CNB. The beneficiaries have no such power and, in fact, CNB would be breaching its fiduciary duties as trustee if it did not seek return of the property. The fact that certain beneficiaries have sued TWA in state court for payment on the Notes pursuant to TWA's guarantee does not change the fact that CNB's claims before us are to protect its rights as owner of the property.[3] The beneficiaries' suit on the guarantee is not an alternative to CNB's action on the Agreement. Of course, we recognize that once CNB obtains the property, the funds it recovers from a subsequent sale or lease must be applied to mitigate the damages of certain noteholders. This, however, does not alter our conclusion that CNB has an obvious interest in the prosecution of this litigation and the return of its property.[4]

■ Besides this argument with respect to discovery, TWA also contends that requiring specific performance of the Agreement's default provisions is inappropriate. Under New York law, which the parties agree governs this issue, a party can be compelled to perform its contractual obligations if the contract is valid, the plaintiff is ready to perform, the defendant is able to perform, and the plaintiff has no ade-

---

**3.** The beneficiaries' suit, filed approximately one week after the instant action began, was brought on by Notice of Motion for Summary Judgment in Lieu of Complaint. The motion is pending in the Supreme Court of the State of New York, County of Westchester.

**4.** We note that TWA, while claiming it did not have time for discovery, did not, prior to the argument of this motion, make any efforts to conduct it.

quate remedy at law. *Travellers Int'l AG v. Trans World Airlines, Inc.*, 722 F.Supp. 1087, 1104 (S.D.N.Y.1989). Moreover, a court will engage in a balancing of hardships between granting monetary damages or specific performance in striving to reach an equitable result. *Concert Radio, Inc. v. GAF Corp.*, 73 N.Y.2d 766, 532 N.E.2d 1280, 1281, 536 N.Y.S.2d 52, 54 (1988). The parties do not dispute the first three elements, but instead, only disagree as to whether CNB has an adequate remedy at law. In addition, TWA argues that it would be inequitable to require it to return the property in light of the tremendous ramifications such an order might have on both TWA and the public at large.

■ Before addressing these particular questions, we must note that this is not the ordinary situation where a party is demanding specific performance of a contractual obligation, notwithstanding the fact that CNB's complaint denominates its demands as such. The contractual obligation placed upon TWA was to pay money in exchange for the use of CNB's property. Technically, if CNB was demanding specific performance of TWA's obligations, it would be demanding that TWA pay the money it owes pursuant to the Agreement. Such a demand, of course, would be futile since TWA has already failed to pay. Instead, CNB seeks to have the property returned, which is the precise remedy the parties previously agreed to. Thus, CNB is not really seeking specific performance of TWA's obligations, but rather, is seeking to enforce a contractual remedy agreed to by the parties in the event of a default. Under this rationale, it is clear that CNB is entitled to return of the property.

New York's laws governing secured transactions permit a party holding a security interest in a chattel to sue on the debt or to foreclose on the collateral. N.Y. U.C.C. § 9–503 (McKinney 1990); *MGD Graphic Sys., Inc. v. New York Press Publishing Co.*, 52 A.D.2d 815, 383 N.Y.S.2d 606, 607–08 (1st Dep't 1976), *aff'd*, 42 N.Y.2d 1018, 368 N.E.2d 835, 398 N.Y.S.2d 657 (1977). In the case at bar, however, CNB is more than a secured creditor, it

actually *owns* the property. It would defy logic for its rights to be more limited than those of a secured creditor, especially when the Agreement specifically affords CNB this remedy. Following TWA's argument, if one were to lease a car from a car dealership and then stop paying, the dealership would not be entitled to demand the return of its car, notwithstanding a specific lease provision permitting it to do so, but rather, would be forced to secure a money judgment against the leaseholder and then attempt to enforce it. If the lessee lacked liquid assets to pay the money judgment, the lessor would be relegated to levying on the lessee's property, which in this instance belongs (at least in part) to it. Such a result would turn property law as we know it on its head and we refuse to do so.

■ Even if CNB's demands are considered traditional claims for specific performance of a contractual obligation, CNB is entitled to summary judgment. TWA claims that CNB will be adequately protected if it secures a money judgment against it for the amount due on the Notes. Since CNB only is required to make payments to the beneficiaries solely from the funds it actually receives from TWA, CNB allegedly is not suffering any loss or risk because of TWA's failure to pay or return the property. Moreover, TWA argues that since it must maintain the planes and engines under strict guidelines from the Federal Aviation Administration, there is no risk of damage to the property.

The suggestion that by obtaining a money judgment CNB will be adequately protected is nothing short of specious. TWA has been teetering on the brink of bankruptcy for years and it is unlikely that it possesses the cash in its coffers to satisfy such a judgment. If TWA had the money, it presumably would not have defaulted in the first place. Instead, the likely scenario would be that after obtaining such a judgment, CNB would be forced to attach TWA's property, like planes and engines, to satisfy the judgment. This would return us precisely to the position we are in today. Requiring such actions would be extremely unfair to CNB in light of the fact that the

Agreement itself provided such a remedy in the event of a default. In addition, the fact that TWA may be adequately safeguarding the property is simply irrelevant. It is CNB's property and it has the right to demand its return.

With respect to the balance of equities, it is difficult to imagine a more grievous wrong than permitting TWA to continue to use CNB's property without bothering to pay for it. Of course, we recognize that by forcing TWA to turn over the property its ability to serve consumers may well be diminished and there may also be a threat to the jobs of TWA employees. However, one of the reasons TWA enunciates for its failure to meet its obligations under the Agreement is a lack of customers. Moreover, recent newspaper articles indicate that it has received permission to sell certain of its international routes to another carrier. This suggests that TWA possesses more planes and engines than it will actually need. This aside, the actual threat to TWA is unclear. TWA's fleet includes two hundred seven planes, while only ten planes are completely involved in the repossession. As to the sixty-two engines, counsel for TWA was unable to tell us how many planes will be affected by their return. Finally, if we compare this action to an eviction proceeding when a tenant has failed to pay rent, the tenant could always argue that he or she will experience greater hardships than the landlord who is simply losing money, especially if the tenant is taking care of the property. Once again, this is an illogical result and would mean that a tenant who fails to pay rent could never be evicted. Just as a tenant can be evicted, a lessee of property who fails to pay can be required to return the property to the owner.

█ The final argument raised by TWA is that it should be excused from satisfying the contract because events beyond its control prevented it from having sufficient funds to meet its obligations. Specifically, TWA argues that the recent Persian Gulf War, which resulted in decreased air travel for fear of terrorism and increased oil prices, has curtailed its cash flow. We have no doubt that all airlines experienced certain financial difficulties because of recent events in the Middle East, but none of these factors excuses TWA from its obligations. First, TWA could have negotiated for a *force majeure* clause in the contract. This was not done and such a clause cannot be read into the contract. While we need not address this question, it is not even clear whether the brief Gulf War would have been sufficient to implicate such a clause. Moreover, all of the alleged factors impacting upon TWA's profits were clearly foreseeable and simply represent the risk of doing business in an international forum. Since as early as 1973, when the OPEC oil embargo took place, it has been quite clear that this country unfortunately is extremely dependent upon foreign oil and that our fuel prices are subject to the whim of that cartel. Similarly, TWA cannot argue that the threat of war in the Middle East is something of which it was unaware. The people of that region have been at war for thousands of years and recent history has been no different. The threat of terrorism is also nothing new. TWA is not entitled to relief from meeting its obligations since all the factors it points to were well within the foreseeable when it entered the Agreement. *See Kel Kim Corp. v. Central Mkts., Inc.*, 70 N.Y.2d 900, 519 N.E.2d 295, 296, 524 N.Y.S.2d 384, 385 (1987) (impossibility excuses performance only if "produced by an unanticipated event that could not have been foreseen or guarded against in the contract"). In fact, looking at the cost of air travel today, international airlines already factor these risks into their fares.

For all the foregoing reasons, plaintiff's motion for summary judgment is granted. Plaintiff will settle an order and judgment consistent with this opinion.

SO ORDERED.