MERCANTILE–SAFE DEPOSIT
AND TRUST COMPANY, as
Trustee, Plaintiff,

v.

TRANS WORLD AIRLINES,
INC., Defendant.

No. 91 Civ. 4491 (GLG).

United States District Court,
S.D. New York.

Aug. 22, 1991.

Debevoise & Plimpton (Steven Klugman, Philomena A. Burke, Robert N. Schwartz, of counsel), New York City, for plaintiff.

Jones, Day, Reavis & Pogue (George T. Manning, Michael J. Templeton, Thomas L. Abrams, of counsel), New York City, for defendant.

## OPINION

GOETTEL, District Judge:

In Herman Melville's "Bartleby the Scrivener," which coincidentally is subtitled "A Story of Wall Street," the protagonist is asked by his employer to examine a document. Bartleby responds with the familiar refrain, "I would prefer not to." This continues for a period of time and the employer becomes increasingly more exasperated. Finally, Bartleby is fired. When asked to leave, however, Bartleby again responds, "I would prefer not to." Bartleby never says, "I can't do it," only that he would rather not. In the case at bar, we are presented with yet another attempt by a creditor of Trans World Airlines, Inc. ("TWA") to collect on a debt.[1] TWA admits it owes the money and that it has the money, but like Bartleby, it would prefer not to pay. Instead, it wants to use the money for other purposes, like purchasing the bankrupt Pan American World Airways ("Pan Am"). *See* Norris, "When the Merely Broke Try to Buy the Bankrupt," *The New York Times*, July 23, 1991, at D1. Would that we could all treat our creditors in a similar fashion.

## I. FACTS

In 1979, plaintiff Mercantile–Safe Deposit and Trust Company, a Maryland institution, and Ozark Air Lines, Inc. ("Ozark") entered into an Equipment Trust Agreement (the "Agreement"). The Agreement provided that plaintiff, as trustee for four institutions who actually financed the deal and now hold equipment trust certificates, would purchase two airplanes, five engines, and various spare parts from Ozark. Ozark would then lease the property from plaintiff in what is traditionally known as a sale/leaseback. After the term of the lease, which was set to expire in 1995, the property was to revert to Ozark. In 1987, defendant TWA merged with Ozark and assumed Ozark's obligations, including the Agreement at issue. Thus, TWA was to make payments to plaintiff and when the lease expired, the property would become TWA's.

As has become common practice with TWA, it defaulted in May 1991 and the debt was accelerated as is permitted under the Agreement. Agreement § 7.02(a). The debt in this case is approximately $6 million, which is relatively small compared to TWA's other outstanding obligations. Thereafter, plaintiff brought the instant action demanding return of the property at issue under theories of specific performance and foreclosure of a security interest. Plaintiff now moves for summary judgment.

## II. DISCUSSION

This action is quite similar to the case of *Connecticut National Bank v. Trans World Airlines, Inc.,* 762 F.Supp. 76 (S.D.N.Y.1991), decided by this court some four months ago. In that case, similar sale/leasebacks were involved and when TWA defaulted, the trustee sought return of its property. In that case, significantly more planes and engines were at issue than in the case at bar. In addition, TWA's debt was over $300 million in that case. We found for the plaintiff and ordered TWA to return the Bank's planes and engines.

In the case at bar, TWA does not contest the existence of the debt or the fact that it has defaulted. Instead, it offers sundry challenges to whether this court should require TWA to return plaintiff's property.

---

1. We have numerous cases before us involving TWA's failure to satisfy its financial obligations. Two written opinions have previously been issued. *See Fleet Nat'l Bank v. Trans World Airlines, Inc.,* 767 F.Supp. 510 (S.D.N.Y.1991); *Connecticut Nat'l Bank v. Trans World Airlines, Inc.,* 762 F.Supp. 76 (S.D.N.Y.1991).

Most of these arguments were raised and rejected in *Connecticut National Bank* and can be easily resolved.

■■■ TWA's initial argument is that we should not entertain a summary judgment motion because little discovery has taken place, the action having only been commenced on July 1, 1991. While we acknowledge that summary judgment should not be granted if the non-moving party has not had an opportunity for discovery, it must be established that the discovery sought will facilitate the creation of a genuine issue of material fact. *See Hudson River Sloop Clearwater, Inc. v. Department of the Navy*, 891 F.2d 414, 422 (2d Cir.1989). In this case, TWA suggests it needs further discovery on the nature of the transaction between Ozark and plaintiff. TWA points to the fact that plaintiff's moving papers refer to the transaction as a sale/leaseback and, alternatively, "as a conditional sale of [property] to Ozark, with the Trustee's retention of a security interest in the [property] to protect against defaults on Ozark's obligations to the Trustee." Plaintiff's Memorandum of Law at 19. There is no doubt that the transaction at issue was a sale/leaseback and plaintiff's alternative suggestion was only offered so as to afford it an additional remedy under the Uniform Commercial Code. Nonetheless, regardless of how the transaction is denominated, plaintiff is entitled to the requested relief and further discovery will not change this result.

■■■ TWA next argues that plaintiff is merely a " 'naked trustee[ ]' [acting] as [a] 'mere conduit[ ]' for a remedy flowing to others." *Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 465, 100 S.Ct. 1779, 1784, 64 L.Ed.2d 425 (1980) (citations omitted). Thus, plaintiff is allegedly not the real party in interest and we must look to the citizenship of the trust beneficiaries to determine if diversity jurisdiction exists. TWA further contends that since there are only four beneficiaries in this case, while there were many more in the *Connecticut National Bank* action, it is obvious that

the beneficiaries are controlling this litigation. Once again, we reject this argument. The Agreement specifically affords plaintiff the power to seek return of the property at issue. Agreement § 7.02(b). Moreover, the trustee is entitled to sue in its own name. *Id.* § 7.10. It is rather disingenuous for TWA to claim that the Agreement it specifically entered into, and which affords plaintiff these rights, should now be ignored.[2] *See Fleet Nat'l Bank*, at 514–15 (further discussion of TWA's "naked trustee" argument).

Another argument raised, and previously rejected, is that TWA cannot meet its obligations because of the Persian Gulf War earlier this year. We rejected this argument four months ago when the events in the Middle East were more recent and we reject it now. The threats of war, terrorism, and excessive oil prices are part of the cost of doing business internationally.

Finally, TWA claims that the equitable remedy of specific performance is inappropriate when plaintiff has an adequate remedy at law. TWA also contends that before such an equitable remedy can be granted, we must balance the hardships that would result from such a ruling.

In the case at bar, the contract specifically states that in the event of a default, plaintiff can demand return of the property at issue. Agreement § 7.02(b). Moreover, the Agreement expressly states that plaintiff can go before any court having jurisdiction to seek "a decree against [TWA] requiring the specific performance [of TWA's covenants under the Agreement]." Agreement § 7.07. This clause makes an even stronger case for plaintiff than was available in *Connecticut National Bank* where no such contractual language was present.

■■■ Even absent this clause, we previously stated that we did not actually consider a party's demand for return of its own property to be a demand for specific performance. *See Connecticut Nat'l Bank*, 762 F.Supp. at 80. The Agreement demands that TWA pay money. Thus, if plaintiff truly were seeking specific performance, it would be demanding that

---

**2.** Of course, we recognize that Ozark actually entered the Agreement with plaintiff. Nonetheless, TWA stepped into Ozark's shoes when it assumed its obligations.

TWA pay money. TWA has already refused to do so and now plaintiff seeks to enforce the specific contractual remedies listed in the Agreement. Thus, since plaintiff is not actually seeking specific performance, there is no need to show the absence of an adequate remedy at law. As we stated in *Connecticut National Bank*, section 9–503 of the Uniform Commercial Code, which coincidentally is the basis for plaintiff's second cause of action, permits a secured party holding an interest in a chattel to either sue on the debt or foreclose on the collateral. N.Y.U.C.C. § 9–503 (McKinney 1990). Plaintiff has chosen to foreclose on the collateral and the adequacy of a remedy at law is irrelevant. As we pointed out in *Connecticut National Bank*, since plaintiff owns the property at issue, his rights are at least equivalent to those of a secured creditor. *Connecticut Nat'l Bank*, 762 F.Supp. at 80.

■ Finally, we must focus on one of the most outlandish arguments this court has seen in almost twenty years on the bench. As previously stated, plaintiff need not establish the absence of an adequate remedy at law to succeed in this action. Assuming there is such a requirement, plaintiff claims its burden is readily satisfied in light of TWA's well-publicized financial difficulties. As we noted in *Connecticut National Bank*, "TWA has been teetering on the brink of bankruptcy for years." *Id.* However, there was $300 million at issue in that case, while TWA only owes $6 million in the case at bar. Thus, TWA argues, plaintiff has an adequate remedy at law because TWA can satisfy a $6 million judgment. TWA points to a recent influx of cash from its sale of certain international routes to another airline. TWA further suggests that its well-documented attempts to purchase Pan Am for millions of dollars further establish that it has the money to satisfy such an insubstantial judgment.[3] Thus, even though TWA has defaulted on its obligations to the plaintiff, it suggests that plaintiff, who actually owns the prop-

erty at issue, should be required to obtain a money judgment and then attempt to collect on that judgment. Why would TWA bother to pay at that stage? Plaintiff would then be forced to satisfy its judgment by attaching the property held by TWA, which is precisely the position it finds itself in today. TWA has the money, but like Bartleby, it would prefer not to pay. Unfortunately for all debtors, this is not the state of the law. If TWA has the money, it should pay its creditors. If not, these creditors are entitled to enforce their contractual and statutory remedies. TWA cannot operate as if it has filed for bankruptcy without complying with the formal mandates of the Bankruptcy Code.

Therefore, summary judgment in plaintiff's favor is granted. Plaintiff is entitled to return of its planes, engines, and spare parts. We recognize that the outstanding debt is approximately $6 million while the purported value of the property is $17 million. Obviously, any excess funds remaining after TWA's obligations to plaintiff have been satisfied will revert to TWA. Plaintiff will settle a judgment consistent with this Opinion.

SO ORDERED.

---

**3.** Following argument of this motion, it was reported that TWA's bid to purchase Pan Am was rejected in favor of a bid by Delta Air Lines, Inc. *See* Cowan, "Delta's Pan Am Bid Approved in Court," *The New York Times*, Aug. 13, 1991, at A1. Although TWA did not have an opportunity to make this argument, we would expect it to suggest that the rejection of this bid simply means that the vast funds it has available will remain in its coffers.