**Stath KARRAS, as Trustee of the Chatham Site PRP Group Trust Fund, et al., Plaintiffs,**

v.

**TELEDYNE INDUSTRIES, INC., et al.   Defendants.**

**No. 99CV0996BTMJAH.**

United States District Court, S.D. California.

March 25, 2002.

James J. Dragna, Daniel W. Nugent, Tiffany Hedgpeth, McCutchen, Doyle, Brown & Enerson, LLP, Los Angeles, CA, for Defendants.

Steven P. McDonald, Cordon T. Baesel, Stephanie E. Kish, Luce, Forward, Hamilton & Scripps, LLP, San Diego, CA, for Plaintiffs.

## ORDER DENYING MOTION FOR SUMMARY JUDGMENT

MOSKOWITZ, District Judge.

Defendants Teledyne Industries and Teledyne Holdings, LLC (collectively, "TDY") filed this motion for summary judgment on August 23, 2001. For the reasons discussed below, TDY's motion is DENIED.

### I. BACKGROUND

This is an action for recovery of clean up costs under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601, et seq. Plaintiffs are Stath Karras, as Trustee of the Chatham Site PRP Group Trust Fund and Stath Karras, as Trustee of the Chatham Site PRP Group RAP Trust Fund ("Plaintiffs" or "Plaintiff trusts"). Plaintiffs initiated suit against various defendants seeking contribution for costs plaintiffs allegedly incurred while investigating and cleaning up contamination at the Chatham Brothers Barrel Yard in Escondido, California.

The material facts are undisputed.[1] In late 1991, the California Department of Toxic Substances Control ("DTSC") issued a demand to potentially responsible parties ("PRPs") to reimburse DTSC for almost $8,000,000 in past response costs incurred at the Chatham Site. In 1992, a group of the PRPs ("PRP Group") entered into an Imminent and Substantial Endangerment Order ("Consent Order") with DTSC, which required the PRP Group to perform work on the Site and develop a Remedial Action Plan ("RAP"). The PRP Group executed the Chatham Site PRP Group Trust Agreement ("Trust Agreement") on October 27, 1992 to perform the work outlined in the Consent Order. Following a lawsuit brought by DTSC on November 18, 1998, the PRP Group entered into a Consent Decree with DTSC, approved by the Court in 1999, to implement remedies at the Site. The PRP Group executed the Chatham Site PRP Group RAP Trust Agreement ("RAP Trust Agreement") on December 8, 1998 to perform the work outlined in the Consent Decree. Grantors of the Trust Agreement and RAP Trust Agreement are parties to the Consent Order and Consent Decree with DTSC.

The Trust Agreements contain similar language relating to the purpose of the trust, grantor contributions to the fund, termination of the fund, and express powers of the trustee. The Grantors have not assigned their CERCLA claims or obligations to the Trusts. However, the stat-

1. This summary of facts is based in large part upon the undisputed facts submitted by the parties. (See TDY's Separate Statement of Undisputed Material Facts and Plaintiffs' Statement in Opposition to Defendants' Separate Statement of Undisputed Material Facts.)

ed purpose of the RAP Trust Agreement is:

> to obtain, hold, invest, and disburse funds, in trust, for the benefit of the Grantors in such a manner as to satisfy the obligations of Grantors pursuant to the RAP Consent Order and RAP Site Participation Agreement with respect to removal and remediation of alleged environmental contamination at the Site and resolution, in part, of the Grantors' alleged liability for remediation of environmental contamination at the Site and, further, to enter into contracts and agreements as directed by the Executive Committee. To fulfill this purpose, the Trustee shall thoroughly familiarize himself with the terms of the RAP Consent Order and the RAP Site Participation Agreement.

The Grantors are obligated to make payments into the Trust funds pursuant to the Site Participation Agreement, which sets forth the manner in which the Grantors will comply with the Consent Order and Consent Decree. The Trusts are funded by payments from the grantors, escrow accounts and settling third parties. Upon termination of the Consent Order and Consent Decree, the Trustee must liquidate the assets of the Fund and distribute the remaining trust property to the grantors, subject to limitations set forth in paragraphs 4.4 and 6.11 of the Trust Agreements.

The Trustee has sole power to perform certain functions, such as to hold, invest and manage the Trust assets, pay administrative costs of the Trusts, retain the services and pay compensation to an accountant, attorney or investment advisor. In addition, the Trustee is required by law to perform his fiduciary obligations pursuant to Cal. Prob.Code §§ 16000–07, 16045–54. To date, the Trustee has used assets of the Trusts to pay DTSC for response costs, as well as contractors and environmental consultants for assessment and remov-

al/remediation of hazardous substances. (Karras Decl., Exh. 3–8.)

With respect to some of his functions, the Trustee takes direction from the Executive Committee, which is elected by the PRP Group. For example, the Executive Committee directs the Trustee to "institute and defend litigation on behalf of or in the name of the Grantors." Furthermore, the Executive Committee directs the Trustee to execute contracts and agreements.

In an Order dated December 3, 1999, this Court dismissed plaintiffs' common law claim for equitable indemnity and upheld Plaintiffs' claim for contribution and declaratory judgment under section 113 of CERCLA, 42 U.S.C. § 9613. The Order also clarified that plaintiffs cannot maintain an independent CERCLA section 107 claim for cost recovery because section 107 claims are limited to innocent parties, stating that, here, plaintiffs are "undeniably PRPs." The Order did not dismiss plaintiffs section 107 claims even though plaintiffs were found to be PRPs, not innocent parties, since a CERCLA section 113 claim for equitable contribution is grounded on the imposition of liability identified in section 107(a).

## II. DISCUSSION

TDY argues that it is entitled to summary judgment because plaintiffs have not incurred response costs as required by CERCLA sections 107 and 113, are not the real parties in interest pursuant to Fed. R.Civ.P. 17(a), and lack standing.

### A. *Cost recovery actions under CERCLA*

█ Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), authorizes suits against certain statutorily defined responsible parties to recover costs incurred in cleaning up hazardous waste disposal sites. *Pinal*

*Creek Group v. Newmont Mining Corp.,* 118 F.3d 1298 (9th Cir.1997). Section 107(a) establishes that PRPs shall be liable for:

(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan....

42 U.S.C. § 9607(a)(4)(A) & (B).

■ CERCLA provides two ways for parties to recover environmental response costs. The section 107(a) cost recovery provision permits the government or an "innocent" private party to recoup cleanup costs from PRPs. PRPs are held jointly and severally liable under this cost recovery provision. *See, e.g., M & M Realty Co. v. Eberton Terminal Corp.,* 977 F.Supp. 683 (M.D.Pa.1997) (noting that every court that has faced the issue has concluded that an innocent landowner can sue other PRPs for joint and several liability).

■ The other method of recovering environmental response costs involves section 113(f)(1), the contribution provision. It allows a PRP to seek contribution from other PRPs if it assumed a disproportionate share of the cleanup costs. Under section 113(f)(1) and 113(g), courts have the discretion to allocate liability for past costs and enter a declaratory judgment for future costs. CERCLA's claim for contribution creates several-only liability. *Pinal Creek Group,* 118 F.3d at 1303. Claims for contribution only occur between co-liable parties. *Id.* at 1306. In further distinction, the statute of limitations for cost recovery actions is six years, whereas it is three years for contribution actions. *See* 42 U.S.C. § 9613(g)(2), (3). However, a PRP's contribution action finds implicit recognition in section 107; section 113

merely regulates its implementation. *Id.* at 1305 n. 7. Thus, plaintiffs asserting actions for both cost recovery and contribution must demonstrate that they have "incurred" necessary response costs. *See Boeing Co. v. Cascade Corp.,* 207 F.3d 1177, 1182 (9th Cir.2000) ("CERCLA provides that a party that releases a hazardous substance is liable for another's response costs, but only if its release caused the other party to incur those response costs ....").

The Ninth Circuit explained the rationale for CERCLA's requirement that private parties "incur" response costs prior to obtaining cost recovery or contribution in *In re Dant & Russell, Inc.,* 951 F.2d 246 (9th Cir.1991). In that case, the Court of Appeals reversed the district court's award of future response costs in a CERCLA action between two liable parties, noting that plaintiffs may obtain a declaratory judgment on liability for future response costs under section 113(g), so long as they have actually incurred some costs. *Dant & Russell,* 951 F.2d at 249. The court explained the policy behind the "incur costs" requirement:

These sections envision that, before suing, CERCLA plaintiffs will spend some money responding to an environmental hazard. They can then go to court and *obtain reimbursement for their initial outlays,* as well as a declaration that the responsible party will have continuing liability for the cost of finishing the job.

... [A]ctual cleanup is encouraged by requiring plaintiffs to incur response costs before they can recover them. Since CERCLA places no strings on the award of response costs, allowing recovery for future costs absent any binding commitment to incur these costs would leave no incentive to complete the cleanup.

*Id.* However, the *Dant & Russell* court also stated that the "case provides no occasion for defining what 'incurred' means—only what it does not mean." *Id.*

**B. *CERCLA's Incur Costs Requirement***

■ TDY argues that the Trusts have not incurred response costs because the Grantors fund the Trusts pursuant to the Site Participation Agreement. TDY contends that it is therefore the Grantors, not the Trusts, that have incurred costs. Plaintiffs argue that the Trusts have incurred costs in carrying out the stated purposes of the Trust Agreements. Indeed, the Trusts are designed "to satisfy the obligations of Grantors pursuant to the RAP Consent Order and RAP Site Participation Agreement with respect to removal and remediation of alleged environmental contamination at the Site . . . ." Thus, plaintiffs argue, the Trust has incurred response costs for the services of environmental consultants and DTSC. (Copies of checks, Karras Decl., Exh. 3–8.)

TDY relies primarily on two cases, *Kamb v. U.S. Coast Guard,* 869 F.Supp. 793 (N.D.Cal.1994) and *Trimble v. ASARCO, Inc.,* 83 F.Supp.2d 1034 (D.Neb.1999), aff'd, 232 F.3d 946 (8th Cir.2000) for the proposition that plaintiffs have not incurred costs. Both *Kamb* and *Trimble* are distinguishable since the cases involved cost recovery actions by innocent parties, not contribution actions.

In *Kamb,* the district court held that a referee appointed by a state court to sell three parcels of land on behalf of the property owners lacked standing because he was not a real party in interest and had not incurred costs. During the marketing of the property, an environmental consultant discovered contamination on the property. Kamb, the referee, hired two consulting firms to assess the contamination and was only partially reimbursed by the property owners. First, the court first

noted that the plaintiff referee had been appointed pursuant to Cal.Code Civ. P. § 873.060, which authorizes the referee to "perform any acts necessary to exercise authority conferred by this title, or by order of the court." *Kamb,* 869 F.Supp. at 796. As such, Kamb was not authorized by statute to bring a lawsuit on behalf of the property owners and was therefore not the real party in interest. Here, in contrast, the Trustee is expressly authorized in the Trust Agreements to "institute and defend" litigation. As discussed below, the Trusts are also the real parties in interest.

■ Secondly, the court held that plaintiff Kamb had not incurred any response costs in respect to his cost recovery action under section 107 of CERCLA because the initial cash outlays paid to the consultants were raised by contributions from the landowners and encumbrances on the property. *Id.* at 769. TDY urges this Court to consider "whose pocket is empty" in analyzing who has incurred costs for the purposes of a CERCLA contribution action. However, this has not been the approach taken by federal courts in section 113 contribution actions brought by voluntary PRP associations. *See, e.g., Kalamazoo River Study Group v. Menasha Corp.,* 228 F.3d 648, 650 (6th Cir.2000) (plaintiff is "unincorporated association of paper manufacturers seeking to recover [Superfund] costs"); *Ekotek Site PRP Committee v. Self, et al.,* 1 F.Supp.2d 1282 1289 (D.Utah 1998) (plaintiff is "voluntary association of approximately 56 members" formed "to negotiate with the EPA to undertake response activities with respect to the [Superfund] Site"). Plaintiff associations are permitted under CERCLA to sue for contribution despite the fact that they are creatures of contract, created to facilitate cleanup and cost recovery efforts of the PRPs. Indeed, the purposes of CERCLA include "facilitating efficient responses to

environmental harm, holding responsible parties liable for the costs of the cleanup, and encouraging settlements that reduce the inefficient expenditure of public funds on lengthy litigation." *B.F. Goodrich v. Betkoski*, 99 F.3d 505, 514 (2d Cir.1996). Here, the Trusts have submitted copies of checks paid to environmental consultants, demonstrating that the Trusts are an efficient means of responding the environmental harm at the Chatham Site.

In further distinction to *Kamb*, the Trusts seek to recover only their equitable share of response costs (*see* Complaint, Prayer for Relief, ¶ 1), not the entire amount of costs incurred to date. In *Kamb*, the referee sought to recover the entire amount of his costs from the United States Coast Guard, a PRP, under CERCLA § 107. Section 107 permits recovery of costs pursuant to joint and several liability. Obviously, it would be unfair and violate principles of tort law to impose joint and several liability on the Coast Guard if the landowners would only be able to recover contribution under section 113. *See Pinal Creek Group*, 118 F.3d at 1301 ("CERCLA simply does not provide PRPs who incur cleanup costs with a claim for the joint and several recovery of those costs from other PRPs.") Here, the Court need not consider this anomalous and potentially inequitable result since plaintiffs do not purport to be innocent parties.

In *Trimble*, the Eighth Circuit affirmed the district court's holding that class action plaintiffs had not incurred costs as required for cost recovery under CERCLA § 107. *Trimble*, 232 F.3d at 958–59. Plaintiffs included a class of real estate owners and tenants who sought cost recovery of sums spent by their attorneys in preparing for litigation concerning the contamination on their land. The class representatives had signed fee agreements with their attorneys which provided for reimbursement only if plaintiffs were ultimately successful in the litigation. The Eighth Circuit rejected plaintiffs' argument that they had "incurred costs," explaining:

We do not dispute plaintiffs' point that a party may be found to have 'incurred' a cost without having actually paid for it. ... [A] finding that a cost has been 'incurred' may be based upon an existing legal obligation. However, the mere possibility even the certainty, that an obligation to pay will arise in the future does not establish that a cost has been incurred, but rather establishes that a cost may be incurred, or will be incurred.

*Id.* at 958.

*Trimble* is similarly distinguishable on the grounds that it involved a cost recovery action by innocent parties rather than a contribution action by PRPs. As explained by the district court, "section 107(a) of CERCLA creates a restitutionary remedy, not a private federal cause of action for damages, and, thus, the plaintiffs must actually spend some money on the cleanup or investigation of the contamination before they may seek reimbursement for their 'response costs.'" *Trimble*, 83 F.Supp.2d at 1039. As the *Trimble* court recognized, the CERCLA policy of speedy environmental cleanup, as described in *Dant & Russell*, is not furthered where plaintiffs' attorneys incur costs to environmentally assess a site and file a class action without doing any actual cleanup. Here, in contrast, the consent order and consent decree ensure that actual cleanup will progress expeditiously at the Chatham Site. Furthermore, the Trusts have incurred costs of cleanup, as evidenced by checks payable to contractors and DTSC. Unlike the contingency fee arrangement in *Trimble*, these payments are not contingent upon the outcome of this litigation.

Plaintiffs argue that the Court should follow the unpublished district court opin-

ions in *Bethlehem Iron Works, Inc. v. Lewis Industries, Inc.*, No. 94–0752, 1996 WL 557592 (E.D.Pa. Oct.1, 1996) and *BCW Associates, Ltd. v. Occidental Chemical Corp.*, No. 86–5947, 1988 WL 102641, at *13, 21, 23 (Sept. 29, 2001) (plaintiff had incurred response costs and was entitled to equitable contribution under section 113 of CERCLA even though the plaintiff borrowed funds to pay for the clean-up). Although the court in *BCW* did not discuss the "incur costs" requirement, the Court finds *Bethlehem Iron Works* instructive.

In *Bethlehem Iron Works*, the defendant to a CERCLA contribution action raised the defense that plaintiff Steel Structures had not "incurred costs" because it paid for the clean-up with "funds that were borrowed, loaned or otherwise given to it from its parent corporation, Harris Steel, Inc., which is not a party to the lawsuit." *Id.* at *51. The court rejected defendant's argument, reasoning that the costs incurred had been paid with checks from the plaintiff and, in addition, CERCLA jurisprudence does not require the court to trace the source of funds or deny recovery of response costs where plaintiffs borrowed the funds. *Id.* Finally, the court noted that the undisputed facts indicated that plaintiff had no revenues and that it borrows money from various companies within the parent holding corporation to pay the response costs. *Id.* at *51, n. 9.

In *Bethlehem Iron Works*, the court refuses to trace the source of funds or hold that plaintiffs do not incur costs where the funds were loaned by a parent corporation. TDY argues that this case is distinguishable since the Trusts did not take out a loan from the grantors and the grantors are not expecting repayment. Thus, TDY argues, it is the grantors and not the Trusts that have incurred costs. However, the Court does not read the *Bethlehem Iron Works* holding so narrowly. In that case, the court noted that the plaintiff

Steel Structures "has no employees, conducts no business, has no significant assets and has no payroll since the end of operations." *Id.* at *16. Thus, it does not appear that the court rested its holding that Steel Structures had "incurred costs" on the grounds that it would repay its parent company since the facts suggest that such repayment would be impossible given its existing operations. Rather, the court refused to narrowly interpret the "incur costs" requirement in the context of a CERCLA contribution action.

TDY contends that plaintiff Trusts cannot maintain a contribution action under CERCLA § 113 because they are not PRPs and are not parties to the consent decrees or consent orders. TDY cites *OHM Remediation Services v. Evans Cooperage Co., Inc.*, 116 F.3d 1574, 1582 (5th Cir.1997), which held that only PRPs may bring contribution actions. In that case, OHM, a contractor, brought an action for cost recovery and contribution for work performed on behalf of a PRP that declared bankruptcy before it paid OHM for its work. Although OHM denied its PRP status, the Fifth Circuit upheld both of its claims. The court noted that the terms "liable or potentially liable" and "PRP" are not defined in the statute. *OHM,* 116 F.3d at 1582. However, since OHM had been sued under the statute, it therefore qualified as a PRP. *Id.* at 1583.

■ Here, as the Court found in its Order dated December 2, 1999, plaintiff Trusts are "undeniably PRPs." The Court recognizes that, unlike the grantors, the Trusts elected their PRP status by contract. However, the statute does not foreclose entities from attaining PRP status by contract. Indeed, CERCLA does not preclude voluntary associations from pursuing section 113 contribution action as PRPs. *See Kalamazoo River Study Group, supra; Ekotek Site PRP Committee, supra.* The

Court is also cognizant of its duty to liberally interpret CERCLA to advance clean-up efforts. Plaintiffs acknowledge their PRP status in the complaint, which states that plaintiffs "bring this action on behalf of the Grantors" (¶ 5) and seeks mere contribution, rather than joint and several cost recovery, as would be available to non-PRP plaintiffs (Prayer for Relief, ¶ 1). Thus, the trusts stand in the shoes of PRPs because they have undertaken the liability for clean-up of the Chatham site.

Furthermore, TDY contends that plaintiffs have disavowed the role of PRPs in this litigation. *See* Nugent Decl., Exh. K (letter addressed to counsel for TDY stating that grantors are not parties to this litigation). The Court finds otherwise. In the cited letter, counsel for the Trusts explains that the grantors are not parties to the litigation and TDY must contact them individually to arrange for depositions. The letter does not say that the Trusts have disavowed their roles as PRPs.

The Court therefore holds that plaintiff Trusts have incurred response costs necessary to maintain a contribution action under CERCLA § 113. This holding is consistent the rationale for the "incur costs" requirement, as explained by the Ninth Circuit in *Dant & Russell.* The plaintiffs assumed the duty to perform clean-up pursuant to the Trust Agreements, have performed actual cleanup on the Chatham site and seek an equitable portion of their response costs.

### C. *Real Parties In Interest*

■ TDY argues that the Trusts are not the real parties in interest and cannot maintain an action under Fed.R.Civ.P. 17(a). Rule 17(a) requires that every action be asserted in the name of the real party in interest. Real parties in interest are the persons or entities possessing the right or interest sought to be enforced through the litigation. The "real party in interest" provision is intended to protect defendants from multiple liability in actions by subsequent claimants and to ensure that the judgment will have preclusive *res judicata* effect. *Pacific Coast Agric. Export Ass'n v. Sunkist Growers,* 526 F.2d 1196, 1208 (9th Cir.1975). As discussed above, the Trusts, have incurred response costs. Karras, as Trustee, seeks to enforce the right of contribution under CERCLA § 113 to recoup the Trusts' equitable share of costs incurred in cleaning up the Chatham Site.

■ TDY argues that this action may not have *res judicata* effect on the grantors because plaintiffs could individually bring the same claims asserted in the complaint. TDY's fears are unfounded. Actions by trustees brought for the benefit of beneficiaries bind the beneficiaries. *See Kerrison v. Stewart,* 93 U.S. 155, 160, 23 L.Ed. 843 (1876) ("[T]he trustee is in court for and on behalf of the beneficiaries; and they, though not parties, are bound by the judgment, unless it is impeached for fraud or collusion between him and the adverse party."); *United States v. Truckee–Carson Irrigation Dist.,* 649 F.2d 1286, 1303 (9th Cir.1981) (recognizing the common law principle that a judgment can bind persons not parties to the litigation in question and not subject in personam to the jurisdiction of the court if the persons are in privity with parties to the litigation), *modified on other grounds,* 666 F.2d 351 (9th Cir.1982), *aff'd in part & rev'd in part on other grounds sub nom, Nevada v. United States,* 463 U.S. 110, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983); 4 Moore's Federal Practice 3d § 17.10[2] ("In cases involving a real party in interest suing for the benefit of another, the preclusive effect of the representative's suit protects the defendant from subsequent suits by the one who

ultimately benefits from the litigation.") Plaintiffs allege to "bring this action on behalf of the Grantors, each of whom could *otherwise* individually bring and maintain the claims asserted in this Complaint." (¶ 5) (emphasis added.) Thus, the Trustee's contribution action will bind the grantors because it is brought on their behalf. Furthermore, the word 'otherwise,' as it is used in paragraph 5 of the complaint, demonstrates the plaintiff's intent to bind the grantors. In other words, the grantors could only bring a CERCLA action on their own behalf if the Trust had not brought this action. Therefore, the Trustee's CERCLA contribution action will bind the grantors so long as the Trusts satisfy the requirements of an express trust under California law and Fed.R.Civ.P. 17(a).

If state or federal substantive law confers on one an enforceable right, that party is a real party in interest with respect to that right or interest. 4 Moore's Federal Practice § 17.10[1]. Rule 17(a) provides that a trustee of an express trust may sue as the real party in interest on behalf of the trust beneficiaries. Fed.R.Civ.P. 17(a). This rule also applies under California law, the state where the trust was created, Cal.Code Civ. P. § 369(a).

TDY also challenges the validity of the Trusts. TDY's argument is unavailing. Under California law, for a trust to be valid, there must be an intent to create a trust, a valid trust purpose, trust property and an ascertainable beneficiary. Cal. Prob.Code §§ 15201–05. The Trust Agreement and RAP Trust Agreement demonstrate the grantor's intent to create the Trusts. These agreements also articulate the purpose and beneficiaries of the Trusts: "to hold invest, and disburse funds, in trust, for the benefit of the Grantors in such a manner as to satisfy the obligations of Grantors pursuant to the Consent Order and Site Participation Agreement . . . ." The Trusts were funded with money contributed from the grantors, DTSC and settling parties.

TDY contends that the Trusts are business or nominee trusts, which are excluded from the definition of trusts under Cal. Prob.Code § 82(b). The Trusts are not business trusts because Section 4.2 of the Trust Agreements grants the Trustee with no authority to conduct business. *See In re Sung Soo Rim Irrevocable Intervivos Trust,* 177 . B.R. 673 676–77 (Bkrtcy. C.D.Cal.1995) (a "business trust" must actually do business, be taxed as a partnership or corporation, and comply with the fictitious names statute). TDY's argument that the Trusts are nominee trusts similarly fails. California Probate Code § 82(b)(14) excludes from the definition of trust any "arrangement under which . a person is nominee or escrowee for another." TDY has provided no California case law interpreting this provision. Black's Law Dictionary definition of "nominee trust" includes trusts where beneficiaries have the power to direct the actions of the Trustee. Here, the Executive Committee, which is comprised of some but not all the grantors, has the power to direct only some of the Trustee's actions. The Trustee retains significant authority to hold, invest and manage the . Trust assets. Therefore, the trusts are valid under California law.

Next, TDY argues that the Trustee is not the real party in interest because he is a mere agent of the grantors. *See* 4 Moore's Federal Practice 3d § 17–33 ("An agent does not acquire real party status and may not bring suit on behalf of another.") Specifically, TDY points out that the Executive Committee directs the Trustee to file litigation and execute contracts. Furthermore, the grantors retain the power to amend or revoke the Trusts and appoint or remove the Trustee. In response, plaintiffs argue that the Trustee retains extensive power to manage and

invest trust assets in accordance with the Trust Agreements and his fiduciary obligations imposed by law.

The Court agrees with the plaintiffs that the powers retained by the grantors and the Executive Committee are not so broad as to make the relationship one of agency. The Ninth Circuit addressed and rejected a similar argument in *Dessar v. Bank of America National Trust and Savings Association*, 353 F.2d 468 (9th Cir.1965). In that case, the trust contained provisions allowing the grantor to direct the sale, investment or disposition of the trust assets, and the power to revoke the trust by written instrument. *Dessar*, 353 F.2d at 472–73. The Court of Appeals permitted the trustee to sue as the real party in interest despite the "extensive powers" retained by the trustor because the trustee was not fully relieved of its broad duties with respect to investment decisions or fiduciary duties imposed statute. *Id.* at 473. Similarly, the Trustee has sole authority to "hold, invest and manage" Trust assets and administer the Trust pursuant to his fiduciary duties imposed by the Probate Code. In addition, the Trustee holds title to the Trust assets in various bank accounts, writes checks from these funds and has sole authority to compromise claims in litigation. Although the grantors may revoke the Trust and may, through the Executive Committee, direct the Trustee to enter into contracts and institute litigation, these powers are not so broad as to turn the relationship into one of mere agency.

Nor do the cases cited by TDY suggest that the Trust is merely an agent of the grantors. The one case relied upon by TDY where the trustee failed to satisfy Rule 17(a) is distinguishable. The district court in *Robin Realty & Management Co. v. Karosen*, 1992 WL 281343 (N.D.Ill. 1992), held that the trustee of a land trust, organized pursuant to an Illinois statute, was not a real party in interest because the functions of the trustee of a land trust were so limited. The court explained that the land trustee merely held title to the land, while the beneficiaries held all of the attributes of ownership of the real estate, such as to possess, manage and physically control the real estate. *Robin Realty* at *4. In contrast, Karras has sole authority to manage trust assets pursuant to the Trust Agreements and the fiduciary duties imposed by statute. Rule 17(a) does not require that the trustee hold the entire "bundle of sticks" be the real party in interest.

The other two cases relied upon by TDY held that the trustee was in fact the real party in interest. The Supreme Court in *Navarro Savings Assoc. v. Lee*, 446 U.S. 458, 465, 100 S.Ct. 1779, 64 L.Ed.2d 425 (1980), rejected the argument that respondents were mere "naked trustees" where the "control over the assets held in their names is real and substantial." Rather, the trustees were the real parties in interest since they held legal title, managed assets and controlled the litigation. *Navarro Savings*, 446 U.S. at 466, 100 S.Ct. 1779. Similarly, the district court in *Connecticut Nat'l Bank. v. Trans World Airlines, Inc.*, 762 F.Supp. 76, 79 (S.D.N.Y. 1991) upheld the trustee's real party status where the trustee owned the property in dispute and would be breaching its fiduciary duties as trustee if it did not seek return of the property. TDY argues that the Trustee is not the real party in interest because, as a corollary to the argument rejected in *Navarro Savings*, he does not possess all the powers possessed by the *Navarro Savings* trustee.

TDY's argument fails because there is no such corollary to *Navarro Savings*. First, the parties do not dispute that the Trustee possesses the sole power to manage Trust assets and compromise claims in litigation. Furthermore, the Trustee holds

title to Trust assets in various bank accounts. (Bank statements, Karras Decl., Exh. 9.) TDY argues that the Trustee does not own the Trust assets because the grantors, and not the Trustee, pay taxes on the trust assets. (Financial Reports, Nugent Decl., Exh. 10.) However, TDY has not cited any case that holds that a trustee must "own" the trust assets to satisfy the real party in interest requirement. The Court agrees with TDY that the powers reserved by the grantors are indeed broad. However, under *Dessar*, these powers are not so broad as to turn the relationship into one of mere agency. Therefore, plaintiff, as trustee of valid express trusts, is the real party in interest pursuant to Rule 17(a).

### D. *Standing*

Plaintiffs have satisfied the constitutional standing requirements. Under Article III, plaintiffs must demonstrate (1) injury in fact, which is both particularized and imminent, (2) causation and (3) redressibility. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). TDY argues that plaintiffs have not demonstrated "injury in fact" because the Trusts have not personally incurred response costs and therefore have suffered no "concrete and particularized" injury. However, as discussed above, the Trusts have "incurred costs" in carrying out the stated purpose of the Trust Agreements. The Trusts have therefore suffered an economic injury sufficient to satisfy Article III standing.

### III. *CONCLUSION*

For the reasons discussed above, defendants' Motion for Summary Judgment [374–1] is hereby DENIED.

**IT IS SO ORDERED.**