**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHUBB CUSTOM INSURANCE
COMPANY, for itself and as subrogee
of, and in the name of Taube Koret
Campus for Jewish Life,
*Plaintiff-Appellant*,

v.

SPACE SYSTEMS/ LORAL, INC., a
Delaware Corporation Successor
Ford Aerospace and
Communications Corp.; FORD
MOTOR COMPANY; SUN
MICROSYSTEMS, INC., a Delaware
Corporation; CHEVRON
CORPORATION; HARMAN
STEVENSON INC., a California
corporation doing business as KFC,
*Defendants-Appellees*.

No. 11-16272

D.C. No.
5:09-cv-04485-
JF

OPINION

Appeal from the United States District Court
for the Northern District of California
Jeremy D. Fogel, District Judge, Presiding

Argued and Submitted
November 8, 2012—San Francisco, California

Filed March 15, 2013

Before: Ronald M. Gould, and Milan D. Smith, Jr., Circuit Judges, and Kevin Thomas Duffy, District Judge.[*]

Opinion by Judge Milan D. Smith, Jr.;
Dissent by Judge Gould

### SUMMARY[**]

### Environmental Law

The panel affirmed the district court's dismissal of an insurance company's subrogation suit under the Comprehensive Environmental Response, Compensation, and Liability Act for recovery of insurance payments made to the company's insured for environmental response costs the insured incurred in cleaning up pollutants released on its property.

The panel held that the insurance company lacked standing to bring suit under CERCLA § 107(a) because it did not incur any "costs of response" related to the removal or remediation of a polluted site, and because the common law principle of subrogation does not apply to § 107(a). The panel held that the insurance company could not bring a subrogation claim under CERLCA § 112(c) because the company did not allege that the insured was a "claimant," or

---

[*] The Honorable Kevin Thomas Duffy, United States District Judge for the Southern District of New York, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

that it had made a claim either to the Superfund or to a potentially liable party.  The panel held that the insurance company's state law claims were time-barred.

Dissenting, Judge Gould wrote that the majority had provided a reasoned explanation of why statutory subrogation under § 112(c) did not apply, but that the majority's analysis of § 107(a) did not honor the insurance company's right to equitable subrogation.

## COUNSEL

Kirk C. Chamberlin (argued), Chamberlin Keaster & Brockman LLP, Encino, California, for Plaintiff-Appellant.

Kevin T. Haroff (argued), Marten Law, San Francisco, California, for Defendant-Appellee Ford Motor Company.

Brent E. Rychener, Holme Roberts & Owen LLP, San Francisco, California, for Defendant-Appellee Sun Microsystems, Inc.

Robert C. Goodman (argued), Rogers Joseph O'Donnell, P.C., San Francisco, California, for Defendant-Appellee Chevron Corporation.

Scott L. Davis (argued), Gardere Wynne Sewell LLP, Dallas, Texas, for Amicus Curiae Chartis Specialty Insurance Company; John G. Nevius (argued) and Alexander Hardiman, Anderson Kill & Olick, P.C., New York, New York, for Amicus Curiae United Policyholders.

**OPINION**

M. SMITH, Circuit Judge:

Plaintiff-Appellant Chubb Custom Insurance Company (Chubb) filed a subrogation suit against Defendants-Appellees[1] for recovery of insurance payments made to its insured, Taube-Koret Campus for Jewish Life (Taube-Koret), for environmental response costs Taube-Koret incurred in cleaning up pollutants released on its property. In the operative Third Amended Complaint (TAC), Chubb asserted subrogated claims under sections 107(a) and 112(c) of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), Pub. L. No. 96-510, 94 Stat. 2767 (1980), as amended, 42 U.S.C. §§ 9601–9675. Chubb also brought subrogated claims under state law. The district court dismissed Chubb's TAC with prejudice under Federal Rule of Civil Procedure 12(b)(6). Chubb appealed the dismissal. We conclude that Chubb has no standing to bring suit under CERCLA section 107(a) because it did not incur any "costs of response" related to the removal or remediation of a polluted site, and because the common law principle of subrogation does not apply to section 107(a); Chubb cannot bring a subrogation claim under section 112(c) because it did not allege that Taube-Koret was a "claimant"; and Chubb's state law claims are time-barred. Accordingly, we affirm the district court.

---

[1] Defendants-Appellees are Space Systems/Loral, Inc., Ford Motor Company, Sun Microsystems, Inc., Chevron Corporation, and Harman Stevenson, Inc. (collectively, Defendants).

## FACTS AND PRIOR PROCEEDINGS

Chubb issued an environmental insurance policy to Taube-Koret covering, among other things, remediation costs related to certain pollution incidents on its property. After extended negotiations, and pursuant to the policy, Chubb paid Taube-Koret $2.4 million as reimbursement for Taube-Koret's cleanup costs of contaminants released on its property. The gravamen of Chubb's complaint is that Defendants should be held jointly and severally liable for Taube-Koret's response costs because they released hazardous substances that migrated to Taube-Koret's property from surrounding land that they owned and operated at various times.[2]

### A.  The Site

The action involves approximately 47 acres of land, which comprises properties located at 3825, 3963, and 3977 Fabian Way and 901 San Antonio Road in Palo Alto, California (in the aggregate, the Site).[3] Chubb alleges that Ford Aerospace & Communications Corporation (Ford Aerospace), now known as Defendant-Appellee Space Systems/Loral, Inc. (Space Systems), owned and used the Site from 1959 to 1990 to manufacture and sell communications satellites, satellite equipment, and missile guidance systems. Chubb claims that Ford Aerospace's manufacturing activities resulted in the release of Volatile

---

[2] The factual background is based on the allegations in Chubb's TAC. We emphasize that these are only *alleged* facts, which have not yet been proven to be true.

[3] The Site later incorporated 851 San Antonio Road in Palo Alto.

Organic Compounds (VOCs) in the soil and groundwater. Chubb further alleges that the Site was under the control and supervision of Defendant-Appellee Ford Motor Company (Ford Motor), the controlling entity of Ford Aerospace prior to 1990. Ford Motor operated a dewatering system located at 3825 Fabian Way and conducted ineffective remediation activities, which exacerbated the soil and groundwater contamination and caused the migration of hazardous substances onto Taube-Koret's property.

On August 16, 1989, the California Regional Water Quality Control Board (Water Board) issued Order No. 89-137, naming Ford Aerospace a discharger of pollutants and requiring it to clean up certain hazardous substances released on the Site. In August 1990, Space Systems purchased the assets of Ford Aerospace from Ford Motor and continued the operations previously conducted by Ford Aerospace. Chubb alleges that Ford Motor expressly agreed to assume liability for compliance with Order No. 89-137 and successive orders. Space Systems currently owns and occupies buildings located at the three Fabian Way properties.

In 1988, Defendant-Appellee Sun Microsystems, Inc. (Sun) acquired 901 San Antonio Road, a 12-acre parcel that became part of the Site. The Water Board named Sun a discharger of pollutants in Order Nos. 93-091, 96-023, and 99-043. The Water Board informed Sun in November 2001 that it intended to oversee the investigation and cleanup of contaminants at 901 San Antonio Road and to recover oversight costs. Chubb alleges that Sun failed to take adequate measures to remediate or abate further contamination caused by Sun's demolition of a vehicle maintenance building previously constructed by Ford Aerospace and known to contain hazardous substances.

In June 2002, Sun sold its 12-acre parcel to Taube-Koret. Chubb alleges that before selling the property, Sun knew about the contaminated soil and groundwater on its property but elected not to take remedial action. The 12-acre parcel on 901 San Antonio Road was later divided into a 4-acre parcel (Parcel 1) and an 8-acre parcel (Parcel 2). Taube-Koret retained Parcel 2 for the purpose of developing an intergenerational community center with an independent and assisted living facility for seniors.

From 1960 to 1977, Defendant-Appellee Chevron Corporation (Chevron) owned and operated a gas service station on a property adjacent to the Site located at 851 San Antonio Road. Chubb alleges that during Chevron's operation and demolition of the gas station, hazardous substances contaminated the soil and spread to the property. Chevron also maintained underground storage tanks containing waste oil and petroleum, which allegedly leaked and spilled into the soil at 851 San Antonio Road.

From 1977 to 2007, Defendant Harman Stevenson, Inc. (Stevenson) owned and operated a Kentucky Fried Chicken restaurant at 851 San Antonio Road. Chubb alleges that during the construction and demolition of the restaurant, Stevenson released hazardous substances left by Chevron, which continued to migrate onto the property.

On November 30, 2006, Taube-Koret purchased 851 San Antonio Road, a parcel adjacent to 901 San Antonio Road, for inclusion in its redevelopment project that involved both properties.

## B. Site Cleanup Orders and Remediation

Soil and groundwater beneath Taube-Koret's property were found to be contaminated with hazardous substances, including VOCs and polychlorinated biphenyls (PCBs). On June 16, 1999, the Water Board issued Order No. 99-043, which required named dischargers to clean up and abate the effects of hazardous substances found on certain portions of the Site: namely, 3825, 3963, and 3977 Fabian Way and 901 San Antonio Road. On August 12, 2003, after Taube-Koret had acquired 901 San Antonio Road, the Water Board issued Order No. R2-2003-0071, amending its previous order and naming Taube-Koret a discharger based on Taube-Koret's June 2002 purchase of the property from Sun. Taube-Koret complied with Order Nos. 99-043 and R2-2003-0071 by performing the requisite environmental investigation, assessment, remedial actions, and removal of hazardous substances on its property. Between January and June 2006, Taube-Koret submitted to the Water Board for approval a Human Health Risk Assessment report, a Site Cleanup Plan (SCP), and a Risk Management Plan (RMP) for the proposed cleanup and development of 901 San Antonio Road. The Water Board approved the SCP and RMP. Taube-Koret removed contaminated soil from 901 San Antonio Road in June and July 2006.

After Taube-Koret acquired 851 San Antonio Road, it submitted a "Workplan for Phase II Investigation" to the Water Board on December 18, 2006, and an Addendum on February 2, 2007, relating to the San Antonio Road properties. On February 7, 2007, the Water Board approved the Workplan and Addendum. On March 14, 2007, the Water Board issued Order No. R2-2007-0023 with respect to Taube-Koret's redevelopment project, directing Taube-Koret

to implement its RMP under a time schedule. Chubb alleges that 851 San Antonio Road, purchased in November 2006 and incorporated into Taube-Koret's redevelopment project, thus became subject to Order No. R2-2007-0023.

In January 2008, during the excavation and remediation of 851 San Antonio Road, Taube-Koret discovered additional contamination. Taube-Koret submitted a soil removal plan to the Water Board, which approved the plan. Between February and March 2008, Taube-Koret completed the excavation and remediation of contaminated soil on 851 San Antonio Road. Chubb alleges that during subsequent excavation activities, Taube-Koret discovered Chevron's waste oil. On March 18, 2008, Taube-Koret removed 550 gallons of waste oil from the ground. Soil samples from the excavation revealed the presence of hydrocarbons and other contaminants. Vapor control systems were installed to minimize the risk of vapor intrusion on the property.

On August 28, 2009, Taube-Koret submitted a detailed completion report regarding all removal and remediation activities completed in compliance with the RMPs and Order No. R2-2007-0023. On September 9, 2009, the Water Board issued written confirmation that Taube-Koret had fully complied with all cleanup orders. Chubb alleges that Taube-Koret incurred $2.4 million in response costs through July 2008 for the removal of pollutants from the San Antonio Road properties.

## C. Insurance Policy and Payment to Taube-Koret

Chubb issued Taube-Koret an Environmental Site Liability Insurance (Policy) for Taube-Koret's two properties on 901 and 851 San Antonio Road, effective from June 21,

2002 to June 21, 2012. Taube-Koret paid Chubb an initial policy premium of $153,259 for the 901 San Antonio Road property, with a policy limit of $10 million and a $50,000 deductible for each pollution incident. The premium was later increased by an additional $37,966 for coverage of 851 San Antonio Road. The Policy included a provision for the Transfer of Rights of Recovery: "If the insured has rights to recover all or part of any payment we have made under this insurance, those rights are transferred to us." The Policy also referenced a "pollution incident" at the 851 San Antonio Road property that was excluded from coverage.

On December 4, 2008, Chubb issued Taube-Koret a check for $2.4 million, which "constituted the necessary cleanup costs for responding to the release of hazardous substances" on its San Antonio Road properties, and represented "payment for all necessary Response Costs claims and incurred" by Taube-Koret, "thereby making [Taube-Koret] whole for its soil remediation costs."

### D.  Procedural History

On September 23, 2009, Chubb filed suit against Defendants. In the original complaint, Chubb asserted CERCLA claims for cost recovery under section 107(a), subrogation under section 112(c), and contribution and declaratory relief under sections 113(f)–(g). Chubb also asserted supplemental state law claims, including contractual and equitable subrogation as well as statutory and equitable indemnity. The district court dismissed Chubb's initial complaint with leave to amend. Chubb subsequently filed two amended complaints, each of which was dismissed by the district court with leave to amend. On January 6, 2011, Chubb filed the operative TAC, renewing CERCLA claims

under sections 107(a) and 112(c).  Chubb also asserted subrogated state law claims for statutory indemnity under the California Health and Safety Code, negligence per se, and strict liability.  The district court dismissed the TAC with prejudice, and entered judgment on behalf of Defendants on April 20, 2011.  Chubb timely appealed.

## STANDARD OF REVIEW

We review de novo the district court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 911 (9th Cir. 2012) (en banc).  When evaluating a Rule 12(b)(6) motion, the district court must accept all material allegations in the complaint as true, and construe them in the light most favorable to the non-moving party.  *Moyo v. Gomez*, 32 F.3d 1382, 1384 (9th Cir. 1994).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Dismissal is proper when the complaint does not make out a cognizable legal theory or does not allege sufficient facts to support a cognizable legal theory.  *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). Although leave to amend should be given freely, *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995), a district court may dismiss without leave where a plaintiff's proposed amendments would fail to cure the pleading deficiencies and amendment would be futile.  *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990) (per curiam).  Where the district court's decision is based on the interpretation of a federal statute, such as

CERCLA, we review that decision de novo. *City of Emeryville v. Robinson*, 621 F.3d 1251, 1261 (9th Cir. 2010).

## DISCUSSION

Congress enacted CERCLA in 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986 (SARA), Pub. L. No. 99-499, 100 Stat. 1613, "in response to the serious environmental and health risks posed by industrial pollution." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009). Through a complex statutory framework, CERCLA provides for the "liability, compensation, cleanup, and emergency response for hazardous substances released into the environment and the cleanup of inactive hazardous waste disposal sites." *Carson Harbor Vill., Ltd. v. Cnty. of Los Angeles*, 433 F.3d 1260, 1265 (9th Cir. 2006) (*Carson Harbor II*) (citation and quotes omitted). CERLCA was intended to promote the timely cleanup of hazardous waste sites, ensure that polluters were held responsible for the cleanup efforts, and encourage settlement through specified contribution protection. *Burlington N.*, 556 U.S. at 602; *City of Emeryville*, 621 F.3d at 1264. To effectuate these goals, CERCLA "grants the President broad power to command government agencies and private parties to clean up hazardous waste sites." *Key Tronic Corp. v. United States*, 511 U.S. 809, 814 (1994).[4] The EPA may either clean up a polluted site itself or compel responsible parties to perform cleanups or reimburse the government for EPA-led cleanups. 42 U.S.C. § 9604(a). The

---

[4] CERCLA vests this authority in the President, who, in turn, has delegated most of his functions and responsibilities to the Environmental Protection Agency (EPA). *See* 42 U.S.C. §§ 9606(c), 9615; 40 C.F.R. § 300.100.

statute imposes strict liability on four categories of potentially responsible parties (PRPs),[5] for the cleanup costs of an environmental hazard, even if the person did not contribute to the contamination. *United States v. Atl. Research Corp.*, 551 U.S. 128, 136 (2007); 42 U.S.C. §§ 9607(a)(1)–(4). CERCLA liability is also joint and several, "meaning that a responsible party may be held liable for the entire cost of cleanup even where other parties contributed to the contamination." *Cal. Dep't of Toxic Substances Control v. Hearthside Residential Corp.*, 613 F.3d 910, 912 (9th Cir. 2010). CERLCA further establishes a tripartite remedial scheme to enable the government and private parties to pursue in a court of law: (1) cost-recovery actions under section 107(a), (2) contribution actions under section 113(f)(1), and (3) subrogation actions under section 112(c)(2). The present appeal only involves the first and third provisions under sections 107(a) and 112(c).

## A. Subrogation Claims under CERCLA

Subrogation is a common law doctrine based in equity that permits an insurer to take the place of the insured to pursue recovery from third-party tortfeasors responsible for the insured's loss. *See Intri-Plex Techs., Inc. v. Crest Group, Inc.*, 499 F.3d 1048, 1053 n.6 (9th Cir. 2007). As the party who pays the insured's loss, the insurer (the subrogee)

---

[5] "These categories include: (1) the current owners and operators of a vessel or facility, (2) the former owners or operators of a facility at the time of disposal of any hazardous substance, (3) any persons who arranged for disposal or treatment of a hazardous substance at any facility owned or operated by another party, and (4) transporters of such substances to a disposal or treatment facility." *Team Enters., LLC v. W. Inv. Real Estate Trust*, 647 F.3d 901, 907 n.2 (9th Cir. 2011); *see also* 42 U.S.C. §§ 9607(a)(1)–(4).

"stands in the shoes" of the insured (the subrogor), and succeeds to the insured's rights and remedies. *See Am. Surety Co. of N.Y. v. Bethlehem Nat. Bank of Bethlehem, Pa.*, 314 U.S. 314, 317 (1941); *In re Hamada*, 291 F.3d 645, 649 (9th Cir. 2002). Aside from equitable subrogation, a subrogation right may be expressly created by contract or statute. *In re Hamada,* 291 F.3d at 649; *Sapiano v. Williamsburg Nat'l Ins. Co.*, 28 Cal. App. 4th 533, 537 n.1 (1994). The right of subrogation, however, cannot be contractually enlarged beyond what is granted in equity. *Sapiano*, 28 Cal. App. 4th at 538. An important limit to the right of subrogation is that it is a purely derivative right—meaning that the subrogee succeeds to rights no greater than those of the subrogor. *United States v. California*, 507 U.S. 746, 756 (1993); *Fed. Ins. Co. v. Union Pac. R.R. Co.*, 651 F.3d 1175, 1177 n.1 (9th Cir. 2011).

Chubb seeks to bring subrogated claims under both sections 107(a) and 112(c) of CERLCA. Specifically, Chubb alleges a section 107(a) claim as the equitable and contractual subrogee of Taube-Koret. Chubb also brings a claim for statutory subrogation under section 112(c). The district court dismissed Chubb's section 107(a) claim for lack of standing because it determined that an insurance payment is not included within the meaning of "costs of response," 42 U.S.C. § 9607(a)(4)(B), as required under the statute, and because permitting a subrogation action under that provision would render section 112(c) a nullity. The district court further dismissed Chubb's section 112(c) claim because Chubb did not allege that Taube-Koret was a "claimant." 42 U.S.C. § 9612(c)(2). Chubb challenges both rulings, arguing that it may bring a section 107(a) claim in subrogation and that the insured need not be a claimant, as defined by CERCLA, for the insurer to bring a subrogated

action under section 112(c).  We draw on well-established canons of statutory construction and relevant case law to determine these issues.

### 1.  Principles of Statutory Interpretation

In interpreting statutes, our task is to construe Congress's intent, and doing so requires us to "begin, as always, with the language of the statute."  *Duncan v. Walker*, 533 U.S. 167, 172 (2001); *accord Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 877 (9th Cir. 2001) (*Carson Harbor I*) (en banc).  We apply the fundamental precept of statutory construction that, unless otherwise defined, "words will be interpreted as taking their ordinary, contemporary, common meaning."  *Perrin v. United States*, 444 U.S. 37, 42 (1979).  But "[w]hen a statute includes an explicit definition, we must follow that definition, even if it varies from that term's ordinary meaning."  *Stenberg v. Carhart*, 530 U.S. 914, 942 (2000); *accord Carson Harbor I*, 270 F.3d at 878.  Moreover, because words necessarily derive meaning from their context, "[i]nterpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis."  *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006); *see also Carson Harbor I*, 270 F.3d at 877 ("We look first to the plain language of the statute, construing the provisions of the entire law, including its object and policy, to ascertain the intent of Congress." (citation and quotes omitted)).  Reviewing the whole statutory scheme is particularly important for a law such as CERCLA, which is a complex regulatory statute with "a web . . . of sections, subsections, definitions, exceptions, defenses, and administrative provisions."  *Carson Harbor I*, 270 F.3d at 880.  We are, however, cautioned against following a literal

interpretation of a statute that would thwart the overall statutory scheme or lead to an absurd result.  *Wilshire Westwood Assocs. v. Atl. Richfield Corp.*, 881 F.2d 801, 804 (9th Cir. 1989).  Although we presume the application of well-established common law principles to a federal statute, this presumption does not apply "when a statutory purpose to the contrary is evident."  *United States v. Texas*, 507 U.S. 529, 534 (1993) (citation and quotes omitted).  Congress need not "affirmatively proscribe" the common law principle to evince this intent.  *Id*. (citation and quotes omitted).

We first consider whether Chubb may pursue a subrogation action under section 112(c), which expressly provides for subrogation, and then consider whether it may assert a section 107(a) claim in subrogation.

### 2.  Subrogation under CERCLA Section 112(c)

The district court ruled that Chubb could not bring a subrogation cause of action under section 112(c) because Chubb had not alleged that Taube-Koret was a "claimant" under the statute, defined as a person who demands compensation for damages or costs from the Superfund or a liable party resulting from a CERLCA violation.

The issue before us is whether Chubb has alleged that Taube-Koret is a "claimant" under CERCLA.    Section 112(c)(2) provides:

> Any person, including the Fund, who pays compensation pursuant to this chapter to any claimant for damages or costs resulting from a release of a hazardous substance shall be subrogated to all rights, claims, and causes of

> action for such damages and costs of removal
> that the claimant has under this chapter or any
> other law.

42 U.S.C. § 9612(c)(2). The statute defines "claimant" as "any person who presents a claim for compensation under this chapter." 42 U.S.C. § 9601(5). A "claim" is "a demand in writing for a sum certain." 42 U.S.C. § 9601(4). Section 112(b) describes the forms and procedures for making a claim, which include "a sworn verification of the claim." 42 U.S.C. § 9612(b)(1). Under the statutory definitions, a claimant then is any person who presents a written demand for reimbursement of monetary costs under the statute—*i.e.*, for a CERCLA violation. The definitions do not include *to whom* this demand should be made, but we have held that "a 'claim' consistently refers to a demand for reimbursement from the Superfund, except for its first appearance in the second sentence of section 112(a),[6] where it refers more generally to a pre-claim/pre-action demand to the liable party." *Idaho v. Howmet Turbine Component Co.*, 814 F.2d 1376, 1380 (9th Cir. 1987) (citation and quotes omitted); *see also* 42 U.S.C. §§ 9601(4), 9612(a); S. Rep. No. 96-848 (July

---

[6] Under section 112(a), "[n]o claim may be asserted against the Fund . . . unless such claim is presented in the first instance to the owner, operator, or guarantor of the vessel or facility from which a hazardous substance has been released, if known to the claimant, and to any other person known to the claimant who may be liable under section 9607 of this title." 42 U.S.C. § 9612(a). In other words, before a claim can be made to the Superfund, a party must first make such a claim against a liable party, if known to the claimant. If the claim to a known PRP has not been satisfied within 60 days of the presentation of the claim in the prescribed manner, the claimant may present the claim to the Superfund for payment. *Id.* But "[n]o claim against the Fund may be approved or certified during the pendency of an action by the claimant in court to recover costs which are the subject of the claim." *Id.*

11, 1980), CERCLA Leg. Hist. 38 (Lexis) at *81 ("In all instances the claimant is required to first present his claim to the potentially liable person or persons, if known, prior to pursuing any right under [section 112].").  We find further support for this reading when section 112(c)(2) is read in conjunction with section 113(g)(4), which provides that "[n]o action based on rights subrogated pursuant to this section *by reason of payment of a claim* may be commenced under this title more than 3 years after the date of payment of such a claim."  42 U.S.C. § 9613(g)(4) (emphasis added).  Thus, in essence, a claimant is a person who demands reimbursement of environmental cleanup costs from (i) the Superfund or (ii) a potentially liable party.[7]

Applied to this case, the definition of claimant required Chubb to make a written demand for payment for its response costs from potentially liable parties (alleged to be Defendants).   If Chubb reimbursed Taube-Koret for the response costs, it could then bring a subrogation claim under section 112(c)(2).  Here, however, Chubb has not alleged that Taube-Koret has made such a demand on Defendants, the Superfund, or any other PRP.  Chubb only alleges that Taube-Koret has made an insurance claim to Chubb.  There is no indication that section 112(c)(2) contemplates this meaning of claimant.  In this section of CERCLA, Congress did not simply use the broader term "person," which the statute also defines; instead, it employed the narrower term "claimant." Reading section 112(c) to authorize subrogation claims irrespective of whether Taube-Koret qualifies as a "claimant," as Chubb urges, "violates the settled rule that a statute must, if possible, be construed in such fashion that every word has

---

[7] Because a successful claim to the Superfund requires a claim to a liable party, if known, a claimant may have made a claim to both entities.

some operative effect." *United States v. Nordic Vill., Inc.*, 503 U.S. 30, 36 (1992); *accord Cooper Indus., Inc. v. Availl Servs., Inc.*, 543 U.S. 157, 167 (2004). An insurer's subrogation right under section 112(c)(2) may be narrower than under common law principles of equitable subrogation, but it is within Congress's right to impose such limits. *See United States v. A & P Trucking Co.*, 358 U.S. 121, 124 (1958) ("[T]he power of Congress to change the common law rule is not to be doubted.").

The limit also makes practical and policy sense. Under the provision, subrogation rights vest once an insured makes a claim to either the Superfund or a potentially liable party. This means that the subrogee assumes the insured's rights to cost recovery, thereby preventing the insured from obtaining double recovery from the insurance company and any PRPs. Here, there is no such risk because Taube-Koret is not alleged to have made any claim or to have identified any PRP. The requirement that a party first request reimbursement from a liable party, if known, also furthers the overall statutory purpose of identifying PRPs and making actual polluters pay for environmental cleanups. *See infra* Part A(5) [Statutory Purpose and Public Policy].

Chubb argues that the district court's interpretation contravenes CERCLA's statutory scheme and legislative history. But Chubb cites no specific statutory language or related materials in support of its position. Instead, Chubb protests that reliance on *Howmet Turbine* is misplaced because the court in that case was discussing the definition of a claim in the context of a notice requirement for a civil action. This argument has no relevance here. Our holding in *Howmet Turbine* that there is no notice requirement for a civil action under section 107(a) bears no relationship to the issue

at hand, namely the definition of a "claim" within the context of CERLCA, which the court clarified. The district court properly dismissed Chubb's section 112(c) claim.

### 3.  Subrogation under CERCLA Section 107(a)

Chubb asserts a CERLCA section 107(a) claim as the subrogee of Taube-Koret. We know of no controlling authority or persuasive circuit authority on the issue of whether section 107(a) authorizes a subrogated cost-recovery action. Thus, we heed the rule that where a common law principle is well-established, we presume that "Congress has legislated with the expectation that the principle will apply except when a statutory purpose to the contrary is evident." *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991) (citation and quotes omitted); *accord Texas*, 507 U.S. at 534. To overcome this interpretative presumption to a statutory scheme, Congress need not give a "clear statement" to that effect, *Soliminio*, 501 U.S. at 108, or "affirmatively proscribe" this principle, *Texas*, 507 U.S. at 534 (citation and quotes omitted). *See also Mohamad v. Palestinian Auth.*, 132 S. Ct. 1702, 1709 (2012) (recognizing that although "Congress is understood to legislate against a background of common-law adjudicatory principles," "Congress plainly can override those principles," through, for example, statutory text that evinces a clear intent to the contrary (citation and quotes omitted)). Here, there is no question that subrogation is a well-settled principle. *See Am. Surety*, 314 U.S. at 317. But, in this case, the presumption in favor of subrogation does not apply under CERLCA section 107(a) because there is clear congressional intent to the contrary, as evident from the statutory text of section 107(a); its interaction with section 112(c), which "speak[s] directly" to the issue of subrogation," *Mobil Oil Corp. v.*

*Higginbotham*, 436 U.S. 618, 625 (1978); and CERCLA's overall statutory purpose.

We first turn to the statutory text of section 107(a) to discern congressional intent. Section 107(a) of CERCLA imposes strict liability on four categories of PRPs for the cleanup of environmental hazards, irrespective of whether they directly contributed to the contamination. *Team Enters.*, 647 F.3d at 907 & n.2; 42 U.S.C. § 9607(a). "Once an entity is identified as a PRP, it may be compelled to clean up a contaminated area or reimburse the Government for its past and future response costs." *Burlington N.*, 556 U.S. at 609. Section 107(a)(4) provides that PRPs are liable for

> (A)  all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

> (B)  any other necessary costs of response incurred by any other person consistent with the national contingency plan . . . .

42 U.S.C. § 9607(a)(4).

Section 107(a) states that PRPs are liable for "necessary costs of response incurred," which are "consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B). Here, because CERCLA clearly defines the key terms "response" and "national contingency plan," we apply the statutory definitions. *Stenberg*, 530 U.S. at 942. The statute defines "response" as "remove, removal, remedy, and remedial action," along with related enforcement activities. 42 U.S.C. § 9601(25). "The terms 'remove' or 'removal'

mean the cleanup or removal of released hazardous substances from the environment," 42 U.S.C. § 9601(23), and the terms "remedy" or "remedial action" mean "those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances. . . ," 42 U.S.C. § 9601(24). Response costs are deemed "necessary" when " 'an actual and real threat to human health or the environment exist[s].' " *City of Colton v. Am. Promotional Events*, *Inc.-W.*, 614 F.3d 998, 1003 (9th Cir. 2010) (quoting *Carson Harbor I*, 270 F.3d at 871). Because the statute does not define "incur," and there is no controlling authority on the term in the CERCLA context, we apply the ordinary meaning, which is "[t]o acquire or come into," "[t]o become liable or subject to as a result of one's action," to "bring upon oneself." *Am. Heritage Dictionary* (4th ed. 2000). Moreover, the response cost must be consistent with the "national contingency plan" (NCP), which outlines specific steps for preparing and responding to contaminations that have been promulgated by the EPA under CERCLA section 105, and was "designed to make the party seeking response costs choose a cost-effective course of action to protect public health and the environment." *City of Colton*, 614 F.3d at 1003 (citation and quotes omitted). "Private party remedial action is 'consistent with the [NCP] if the action, when evaluated as a whole, is in *substantial compliance* with . . . [certain procedural requirements], and results in a CERCLA-quality cleanup.' " *Caron Harbor II*, 433 F.3d at 1265 (quoting 40 C.F.R. § 300.700(c)(3)(i)).

Applying these definitions, section 107(a) plainly applies to a person who, through his or her own actions, becomes statutorily liable for, or is subject to, the costs related to the

cleanup of hazardous substances or the permanent remediation of a release or threatened release of hazardous substances into the environment in a manner consistent with the NCP. Here, Chubb only alleges that Taube-Koret, by virtue of its ownership of the San Antonio Road properties, became statutorily liable under CERCLA for the response costs related to the cleanup of the contaminated soil on those properties. Chubb does not dispute that the TAC lacks any allegation that Chubb, by any independent action of its own or by ownership of Taube-Koret's property, became liable for those response costs under CERLCA. Chubb only alleges that by virtue of reimbursing Taube-Koret under its Policy, it became subrogated to Taube-Koret's right to pursue a section 107(a) claim. But a subrogee—simply by stepping into the shoes of the insured via a reimbursement—cannot be liable for response costs under CERLCA, and thus cannot itself incur response costs. *See* 42 U.S.C. § 9607(e)(1) ("No indemnification . . . shall be effective to transfer from the [PRP] . . . to any other person the liability imposed under this section."). Here, Chubb did not become statutorily liable for Taube-Koret's response costs under CERCLA, but only contractually responsible for those costs pursuant to the terms of an independent insurance policy. Chubb reimbursed Taube-Koret for those costs after the completion of the cleanup by Taube-Koret, and after the bill for the cleanup was already paid by Taube-Koret. In essence, an insurer that is only obligated to reimburse the insured for cleanup costs does not itself incur response costs. *See United States v. Atl. Research Corp.*, 551 U.S. 128, 139 (2007) (observing that "by reimbursing response costs paid by other parties, the PRP has not incurred its own costs of response and therefore cannot recover under § 107(a)"). Chubb cannot circumvent the plain meaning of section 107(a) by piggybacking on a subrogation principle under state law, which the plain

language of section 107(a) does not support, or by inscribing a broader subrogation right by contract. *See Century Indem. Co. v. London Underwriters*, 12 Cal. App. 4th 1701, 1708 (1993) ("[T]he insurer has the legal right to place subrogation agreements in their policies so long as they do not contravene applicable statutes."). The requirement that a party incur response costs itself also makes sense because that party is ultimately liable for the cleanup and remains liable for any subsequent pollution. In contrast, an insurer such as Chubb does not assume liability for CERCLA cleanups as a PRP, and thus should not have a one-sided right to pursue subrogated claims to recoup insurance payments. *See* 42 U.S.C. § 9607(e)(1); *infra* Part A(5).

Our reading of section 107(a) is consistent with our CERCLA jurisprudence. Although there is no controlling authority on the issue of whether an insurer may bring a subrogated cost-recovery claim under section 107(a), we have consistently tracked the express language of section 107(a) in defining the scope of that provision.[8]

---

[8] *See, e.g.*, *Carson Harbor II*, 433 F.3d at 1265 (defining section 107(a) as permitting "private parties who incur cleanup costs to recover those costs from 'various types of persons who contributed to the dumping of hazardous waste at a site.'" (quoting *Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1152 (9th Cir. 1989)); *Carson Harbor I*, 270 F.3d at 870–71 (stating that to establish a prima facie case of liability under section 9607(a), the plaintiff must show, *inter alia*, that "a release or threatened release" of hazardous substances from a facility "has caused the plaintiff to incur response costs that were necessary and consistent with the national contingency plan" (citations and quotes omitted)); *3550 Stevens Creek Assocs. v. Barclays Bank of Cal.*, 915 F.2d 1355, 1358 (9th Cir. 1990) (same); *City of Colton*, 614 F.3d at 1002–03 (same); *Kotrous v. Goss-Jewett Co. of N. Cal.*, 523 F.3d 924, 929 (9th Cir. 2008) ("CERCLA § 107(a) authorizes suits against certain statutorily defined responsible parties to recover costs incurred in cleaning up hazardous

Nevertheless, in support of its position, Chubb relies on the Supreme Court's recent analysis in *United States v. Atlantic Research Corp.*, 551 U.S. 128 (2007), concerning the relationship between CERCLA sections 107(a) and 113(f). Amicus Chartis Specialty Insurance Company (Chartis) also contends that *Atlantic Research* opens the door wide for any person to commence litigation to recover cleanup costs against other PRPs.     But *Atlantic Research* actually undermines, not supports, Chubb's and Chartis's position.  In that case, Atlantic Research Corporation, a lessee of a facility operated by the Department of Defense, retrofitted rocket motors for the United States, and contaminated the soil and groundwater on its site.  *Atl. Research*, 551 U.S. at 133. Atlantic Research cleaned up the site at its own expense and then sought to recover some of the costs by suing the United States under section 107(a).  *Id.*  The United States moved to dismiss on the ground that section 107(a) does not allow PRPs, such as Atlantic Research, to recover costs under that provision.  *Id.* at 133–34.  The district court dismissed the action, and the Eighth Circuit reversed.  *Id.* at 134.

The issue before the Supreme Court was whether section 107(a) provides PRPs with a cause of action to recover from other PRPs, separate and distinct from section 113(f)(1), which authorizes one PRP to sue another for contribution (1) during or following a civil action under section 106 or 107(a) and (2) after private parties have settled their liability with the Government, 42 U.S.C. § 9613(f)(3)(B).  *Id.* at 131, 132 n.1. More specifically, the parties' dispute centered on what "other person[s]" may sue under section 107(a)(4)(B).  *Id.* at

waste disposal sites." (citations and quotes omitted)).    There is no indication of a broader understanding of section 107(a) beyond the express language of the statute.

134.  Applying the maxim that statutes must "be read as a whole," the Court determined that the express language of section 107(a), read in its context, permits PRPs to bring section 107(a) claims against other PRPs.  *Id.* at 135, 141. Reading the adjacent subparagraphs (A) and (B) of section 107(a) together and noting their structural similarity, the Court interpreted "any other person" to mean any person other than the U.S. Government, a state, or an Indian Tribe. *Id.* at 135–36.  The Court observed that each subdivision under section 107(a) "concerns certain costs that have been incurred by certain entities and that bear a specified relationship to the national contingency plan."  *Id.* at 135. The Court concluded that "the plain language of subparagraph (B) authorizes cost-recovery actions by any private party, including PRPs."  *Id.* at 136.

Chubb argues that the Court's reading of "any other person" under section 107(a) supports its position that insurance companies, too, should be included as a party under that provision.  However, the Court's interpretation of "any other person" under 107(a) is limited to "a private party that *has itself incurred cleanup costs*."  *Id.* at 139 (emphasis added).  The Court made the express distinction that, in contrast to section 113(f)(1), section 107(a) "permits a PRP to recover *only the costs it has 'incurred' in cleaning up a site*."  *Id.* (emphasis added) (quoting 42 U.S.C. § 9607(a)(4)(B)).  In contrast, "[w]hen a party pays to satisfy a settlement or a court judgment, it does not incur its own costs of response.  Rather, it reimburses other parties for costs that those parties incurred."  *Id.*  When a PRP "pays money to satisfy a settlement agreement or a court judgment," it "may pursue § 113(f) contribution," but "*by reimbursing response costs* paid by other parties, the PRP *has not incurred its own costs of response* and therefore cannot recover under

§ 107(a)." *Id.* (emphasis added). "As a result, though eligible to seek contribution under § 113(f)(1), the PRP cannot simultaneously seek to recover the same expenses under section 107(a)." *Id.* The Court's reading of the two provisions therefore allowed for *complementary* causes of action to persons in different procedural circumstances. *Id.*

While the Supreme Court examined section 107(a) as it specifically intersects with section 113(f), the Court's distinction between a response cost and reimbursement may be applied to clarify the proper scope of section 107(a) in relation to section 112(c). Under the Court's ruling, Taube-Koret, as a PRP, may seek contribution against other PRPs under section 107(a) if it voluntarily cleans up the environmental hazard. But the Court's ruling does not authorize a private party who has only incurred reimbursement costs, such as Chubb, to file suit under that provision. Just as a PRP "has not incurred its own costs of response," by reimbursing other parties' response costs, Chubb has not incurred response costs solely by virtue of reimbursing Taube-Koret for Taube-Koret's response costs under an insurance policy.

In support of their position, Chubb and Chartis also rely on *Karras v. Teledyne Industries, Inc.*, 191 F. Supp. 2d 1162 (S.D. Cal. 2002), and *Basic Management, Inc. v. United States*, 569 F. Supp. 2d 1106 (D. Nev. 2008). But these cases are neither binding on this court nor apposite, and in fact, only undercut their argument. In *Karras*, the district court held that the plaintiff Trusts incurred response costs necessary to maintain a contribution action under section 113 because it contractually assumed the duty to clean up the polluted site and performed the actual cleanup. 191 F. Supp. at 1170. In contrast, Chubb did not engage in any of the

remediation activities itself, and the Policy it issued Taube-Koret was not executed for the purpose of cleaning up a polluted site. Rather, the Policy insures Taube-Koret against the risk of liability and provides for environmental cleanup costs it could potentially incur on its property. Chartis also relies on *Basic Management*, but in that case, corporate PRPs brought a suit for direct recovery and contribution against the government under sections 107(a) and 113(f) to recover a portion of remediation costs. *Basic Management*, 569 F. Supp. at 1112. The district court determined that plaintiffs had not incurred response costs because, under the insurance policy, the insurer "pays the vendors directly and is obligated to do [so] in the future," in connection with remediation activities. *Id.* at 1120, 1121. Enabling plaintiff PRPs to obtain contribution in such circumstances would also lead to double recovery, which is barred under CERCLA. *Id.* at 1123. Here, in contrast, Chubb does not allege that it directly paid for response costs related to the removal and remediation activities on the San Antonio Road properties; rather, it only alleges that it reimbursed Taube-Koret after completion of the cleanup.[9]

Accordingly, the statutory text of section 107(a) does not support an application of subrogation under that provision. The express language of section 107(a), as interpreted by the Supreme Court and this circuit, is inconsistent with reading that provision as permitting a type of derivative incurment of

---

[9] Chubb additionally argues, without support, that prohibiting a subrogation claim under section 107(a) impairs its right to private contract under the Due Process Clause of the Fifth Amendment by nullifying its contractual subrogation rights. Chubb is mistaken. CERCLA expressly provides for subrogation under section 112(c), and does not foreclose subrogation claims under state law. *See* 42 U.S.C. §§ 9672(a), 9607(e).

response costs through subrogation.  Because "[i]t is our function to give the statute the effect its language suggests, however modest that may be," *Morrison v. Nat'l Austl. Bank, Ltd.*, 130 S. Ct. 2869, 2886 (2010), we conclude that Chubb lacks standing to sue under section 107(a) because it has not itself become statutorily liable for response costs under CERCLA.

### 4.  Statutory Scheme

Because we must review the words of a statute "in their context and with a view to their place in the overall statutory scheme," *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989), we next examine the interaction of section 107(a) within the context of CERCLA's remedial scheme—specifically, its interaction with section 112(c)—to further determine Congress's intent.  In dismissing Chubb's section 107(a) claim, the district court concluded that allowing Chubb to bring a claim under section 107(a) would thwart the remedial scheme under CERCLA because doing so would render "§ 112(c) a nullity."  The district court's ruling accords with the rules of statutory interpretation and the Supreme Court's analysis in *Atlantic Research.*

In interpreting statutes, we observe the "cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (citation and quotes omitted); *United States v. Tohono O'Odham Nation*, 131 S. Ct. 1723, 1730 (2011) ("Courts should not render statutes nugatory through construction.").  Applying this principle, one district court within our circuit addressed the issue of whether an insurer may recover insurance payments

under section 107(a). *See Cal. Dep't of Toxic Substances Control v. City of Chico*, 297 F. Supp. 2d 1227 (E.D. Cal. 2004). In that case, an insurance company filed suit against PRPs under CERCLA section 107(a) after expending funds in connection with the remediation of a hazardous waste site. *Id.* at 1231. The insurer asserted a claim under section 107(a) to recover its insurance payment, arguing that "any other person" under the statute means "any person who has incurred response or remedial costs, including a liability insurer." *Id.* at 1232. The district court rejected this argument, concluding that permitting insurers to sue under section 107(a) would render CERCLA's subrogation provision under section 112(c) "nugatory." *Id.* at 1233. We agree.

Section 112(c) permits an insurer like Chubb to file a subrogation action for reimbursement of costs from PRPs, so long as it complies with the statutory requirements, including the requirement that Taube-Koret be a "claimant." 42 U.S.C. § 9612(c)(2). Enabling Chubb, as Taube-Koret's subrogee, to proceed under section 107(a) for reimbursement of its insurance payment is far broader than what is contemplated under section 112(c), and therefore would impermissibly swallow—not complement—the subrogation provision. Such an effect is distinct from merely a minor overlap in statutory provisions. When given a choice, parties would undoubtedly choose to pursue a subrogated action under section 107(a), which does not include the "claimant" requirement, thereby rendering section 112(c) meaningless. In other words, if Congress had contemplated permitting equitable subrogation under section 107(a), there would have been no purpose in enacting a separate, narrower subrogation provision under 112(c), because, in this case, for example, Chubb would have been able to proceed under both sections 107(a) and 112(c)

regardless of whether Taube-Koret had made a claim.  It is a well-established rule of statutory construction that courts should not interpret statutes in a way that renders a provision superfluous.  *See Tohono O'Odham Nation*, 131 S. Ct. at 1730; *Atlantic Research*, 551 U.S. at 137 (noting that it is inappropriate to "adopt a textually dubious construction that threatens to render the entire provision a nullity"); *Solimino*, 501 U.S. at 111–12 (rejecting application of preclusion, a common law principle, to a federal statute because applying the principle would render a section superfluous).  In contrast to the reading urged by Chubb, the Court's interpretation of sections 107(a) and 113(f) in *Atlantic Research* allows for complementary remedies because it permits different remedial schemes (*i.e.*, direct recovery and contribution) under distinct procedural circumstances, thus obviating the nullifying effect of Chubb's interpretation of section 107(a).  *See Atl. Research*, 551 U.S. at 139.[10]

Chartis counters that a subrogation claim is expressly contemplated under CERCLA section 107(e)(2).    But Chartis's argument is not supported by the plain language of that provision.  Section 107(e)(2) provides that "[n]othing in this subchapter . . . shall bar a cause of action that an owner or operator or any other person subject to liability under this section, or a guarantor, has or would have, by reason of subrogation or otherwise against any person."  42 U.S.C. § 9607(e)(2).  A "guarantor" is "any person, other than the owner or operator, who provides evidence of financial responsibility for an owner or operator under this chapter." 42 U.S.C. § 9601(13).  A related statutory provision suggests

---

[10] Additionally, the fact that *City of Chico* was decided before *Atlantic Research* and *Kotrous* does not affect its structural analysis, which remains sound.

that a "guarantor" includes insurers. *See* 42 U.S.C. § 9608(d)(1) ("The total liability of any guarantor in a direct action suit brought under this section shall be limited to the aggregate amount of the monetary limits of the *policy of insurance*, guarantee, surety bond, letter of credit, or similar instrument obtained from the guarantor by the person subject to liability under section 9607. . . ." (emphasis added)).  But irrespective of whether an insurance company qualifies as a "guarantor," section 107(e)(2) simply clarifies that nothing in CERCLA shall "bar," *i.e.*, operate as an impediment to the assertion of proper subrogation claims.  This is consistent with the district court's acknowledgment that subrogation claims are not foreclosed to Chubb, as long as they are brought in a manner authorized by the law, such as under section 112(c) and relevant state law claims.  Thus, while CERLCA does not bar subrogation claims under specified conditions or pursuant to state law, this does not mean that section 107(e)(2) creates a separate right to bring a subrogated action under section 107(a).

The Dissent nevertheless maintains that equitable subrogation should be permitted under section 107(a) because there is no showing that Congress intended statutory subrogation under section 112(c) to be exclusive, and because there is no showing that Congress intended to eliminate consideration of equitable subrogation.  But while CERCLA does not expressly proscribe equitable subrogation under section 107(a), it need not do so to evidence congressional intent. *Texas*, 507 U.S. at 534.  Congress's statutory intent against subrogation under section 107(a) is made abundantly clear by the plain language of section 107(a); its statutory scheme vis-à-vis section 112(c), which "speak[s] directly" to the issue of subrogation, *Mobil Oil*, 436 U.S. at 625; and considerations of CERCLA's purpose, *see infra* Part A(5).

By contrast, in *United States v. Bestfoods*, 524 U.S. 51, 62–64 (1998), the Supreme Court held that a parent corporation may be held derivatively liable under section 107(a) of CERCLA where the corporate veil is pierced because CERCLA does not speak to this specific common law principle. Likewise, we recognized that CERCLA does not address the particular issue of successor liability, and thus applied traditional rules of successor liability under CERCLA. *See Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant, Inc.*, 159 F.3d 358, 362–64 (9th Cir. 1997). While CERCLA is silent as to issues of piercing the corporate veil and successor liability, however, it is not silent on the issue of subrogation: Congress implicitly conveyed the intent, through the plain language of section 107(a), that a derivative incurment of response costs was not contemplated under section 107(a), and also expressly conveyed this purpose by enacting a separate subrogation provision under section 112(c), which would be rendered superfluous by permitting a subrogation suit under section 107(a). *See Mohamad*, 132 S. Ct. at 1706–09 (declining to apply the common law principle of organizational liability in tort actions to the meaning of an "individual" in a federal statute because the statute's text and scheme evinced a clear intent to the contrary). Moreover, both *Bestfoods* and *Atchison* dealt with the extension of *liability* under common law principles to certain entities under CERCLA, not with who has standing to pursue an action under section 107(a). In contrast to an application of subrogation to section 107(a), neither the application of piercing the corporate veil nor successor liability to CERCLA is constrained by any express statutory requirement, such as the requirement that the suing party incur response costs, or by any other statutory provision.

### 5.  Statutory Purpose and Public Policy[11]

Because Chubb did not allege that Taube-Koret was a claimant, as expressly defined by CERCLA, it is precluded from bringing a subrogation action under section 112(c). Further, both the plain statutory language and overall scheme of CERCLA indicate that an insurer cannot bring a subrogation action under section 107(a) when it has not itself incurred response costs.  As the Supreme Court has observed, "[g]iven the clear meaning of the text, there is no need . . . to consult the purpose of CERCLA at all," as " 'it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.' "  *Cooper Industries*, 543 U.S. at 167 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998)); *see also United States v. Aerojet Gen. Corp.*, 606 F.3d 1142, 1151 (9th Cir. 2010) (declining to be persuaded by policy arguments where CERCLA statutory provisions are unambiguous). Nevertheless, given the complexity of CERCLA, we consult statutory purpose to see if the plain text of 107(a) and 112(c) clearly is inconsistent with congressional intent or leads to absurd results.

---

[11] As we have done previously, we primarily look to the overall statutory scheme and the purposes animating CERCLA to determine congressional intent, rather than the legislative history materials.  *Hearthside Residential*, 613 F.3d at 914 n.4.  This is because, although we "review the legislative history to ensure that there is no clearly contrary congressional intent," *Carson Harbor I*, 270 F.3d at 884, "the direct evidence of CERCLA's legislative history includes 'few truly relevant documents,' perhaps because of the last-minute compromise that resulted in a 'hastily assembled' final bill," *Hearthside Residential*, 613 F.3d at 914 n.4 (quoting *Carson Harbor I*, 270 F.3d at 885 & nn.13–14).

"Our court construes CERCLA liberally to effectuate the statute's two primary goals: (1) to ensure the prompt and effective cleanup of waste disposal sites, and (2) to assure that parties responsible for hazardous substances [bear] the cost of remedying the conditions they created." *City of Los Angeles v. San Pedro Boat Works*, 635 F.3d 440, 447 (9th Cir. 2011) (citation and quotes omitted). Chubb and Chartis advance two main public policy arguments.

First, Chubb and Chartis argue that affirming the district court's decision would make it more difficult for insurers to access remedies under CERCLA. This would risk the winnowing of insurance products offered, leaving some markets unserved or underserved. The net result, they argue, would be a decrease in the overall insurance money available to cover remediation costs under CERCLA. This, in turn, undermines the purpose of CERCLA to facilitate prompt cleanup of hazardous sites.

We find this argument unpersuasive. As a preliminary matter, we emphasize that subrogation actions are not foreclosed to insurers like Chubb. Insurers may still avail themselves of statutory subrogation pursuant to section 112(c) and under relevant state law, as long as they comply with specified requirements. Moreover, there is no evidence—and Chubb and Chartis have furnished none—that Congress contemplated funding of environmental cleanups through insurance money. CERCLA establishes a trust fund, commonly known as "Superfund," which is financed through taxes on certain chemicals and by general revenues. *Exxon Corp. v. Hunt*, 475 U.S. 355, 359 (1986), *superseded by statute on other grounds as stated in Manor Care, Inc. v. Yaskin*, 950 F.2d 122, 125 (3d Cir. 1991). Under certain conditions, the federal government may use the Superfund to

finance cleanup efforts, which it may then replenish by filing suits against PRPs under section 107(a).  *See Bestfoods*, 524 U.S. at 55; 42 U.S.C. §§ 9601(11), 9604; 26 U.S.C. § 9507.  Alternatively, the federal government can issue an order directing the PRPs to finance and clean up the site. 42 U.S.C. § 9606(a); *see also Pakootas v. Teck Cominco Metals, Ltd.*, 452 F.3d 1066, 1072–73 (9th Cir. 2006) (discussing the four methods by which the EPA ensures the prompt cleanup of hazardous waste sites).  PRPs may then seek direct recovery or contribution from other PRPs under sections 107(a) and 113(f), respectively.  A PRP, which is the subject of a cleanup order, such as Taube-Koret, may have abated its risk through an environmental insurance policy, but it is ultimately responsible for financing and cleaning up the polluted site.    Insurance companies generally do not themselves pay for the cleanup costs *as they are incurred*, but only after its completion and after a claim is made.  This is what Chubb alleges happened in this case.  Thus, it does not follow that the availability of insurance money expedites cleanup activities.

Furthermore, there is no evidence that insurance companies rely on the availability of CERCLA remedies in issuing environmental policies.  Nor is there evidence that insurers depend on CERCLA recoveries to stay in business. An insurer's business and growth depends on the collection of premiums and the small likelihood of paying claims, rather than recovery through lawsuits.  *See Gerrish Co. v. Univ. Underwriters Ins. Co.*, 947 F.2d 1023, 1028 (2d Cir. 1991) ("[W]hen the insurer issues a policy and accepts payment for insurance coverage under that policy, the insurer agrees to assume the risks enunciated in the policy."); *Richardson v. GAB Bus. Servs., Inc.*, 161 Cal. App. 3d 519, 523 (1984) ("Essential to insurance is the element of shifting of the risk

of loss, subject to contingent or future events, by a legally binding agreement."); 42 U.S.C. § 9671(1) (defining insurance as an "arrangement for shifting and distributing risk which is determined to be insurance under applicable State or Federal law").

Here, Chubb assumed the risk that it would have to pay on the Policy and received premium payments (totaling nearly $200,000) to compensate it for assuming that risk.[12] Additionally, at present, despite the apparent paucity of cases in which insurers have successfully brought a subrogation claim under section 107(a), the market for environmental insurance companies appears to be robust and growing. *See* William Pritchard Jr., *Pollution Solution*, American Agent & Broker (Feb. 2011) (observing that from 1990 to 2010, the number of companies offering environmental insurance products jumped from four to forty, amounting to a thousand percent growth over twenty years); David J. Dybdhal, *Environmental Risks and Insurance Market Place Update*, American Risk Management Resources Network (March

---

[12] The Dissent argues, however, that "in the long run," insurers cannot be expected to indemnify companies for environmental cleanups without charging a premium reflecting the risk of monetary loss, and that "risk will necessarily increase if the insurer cannot seek contribution from prior polluters and property owners." This will, in turn, discourage or delay cleanups, and thus undermine CERCLA's purpose. But the Dissent's argument assumes that section 107(a) is the only means by which insurance companies can recover its insurance payments. That is clearly not the case, as we repeatedly emphasize in this opinion. Insurers may assert both section 112(c) and state law subrogation claims under certain conditions. Moreover, the Dissent acknowledges that insurers need not increase insurance premiums, but have the alternative option of conditioning payment on a prior claim by the insured against other contributors of the pollution. As we discuss in this section, that is exactly what CERCLA section 112(c) calls for, and for good reasons.

2009) (reporting that the environmental insurance market place continues to experience exceptional organic growth rates averaging between ten and fifteen percent annually, in contrast to the three percent underlying organic growth rate of the traditional property and liability insurance market), *available at* http://www.armr.net/EnvMar3-2009.pdf. Thus, the risk of winnowing insurance products appears unsubstantiated.

Second, Chubb and Chartis argue that conditioning a section 112(c) claim on whether the insured has made a claim to either the Superfund or other PRPs places further unnecessary roadblocks that prevent an insurer from perfecting its right to pursue other PRPs for response costs. This not only slows down the remediation process, but also enables actual polluters to receive an undeserved free pass, simply because the remediation costs were paid by the insurance company.

This argument fares no better than the first. It could be argued, as does the Dissent, that placing limits on a broad subrogation right under CERCLA would encourage insurance companies to rewrite their policy and explicitly condition insurance payments on whether the insured brings suit or makes a claim. According to the Dissent, this would discourage or delay cleanup. But as a preliminary matter, Congress did not contemplate that insurance money would be the catalyst for cleanups. Indeed, it is completely beside the point since CERCLA ensures the prompt cleanup of hazardous sites through four options given to the EPA: (1) it can investigate and remediate the polluted site itself and later seek recovery of response costs from PRPs, 42 U.S.C. §§ 9604, 9607; (2) it can initiate settlement negotiations with PRPs, 42 U.S.C § 9622; (3) it can file suit in federal district

court to compel PRPs to abate an "imminent and substantial" threat to public health or welfare, 42 U.S.C. § 9606(a); or (4) it can issue cleanup orders to PRPs, 42 U.S.C. § 9606(a). *Pakootas*, 452 F.3d at 1072–73. Here, the alleged cleanup of the San Antonio Road properties by Taube-Koret was prompted by the Water Board's orders, not its Policy with Chubb. If a PRP, such as Taube-Koret, receives a cleanup order and refuses to comply, then CERLCA provides for certain enforcement options. For example, the EPA may initiate the cleanup of the facility itself, and the party responsible for the pollution is potentially liable for cleanup costs. *Id.* at 1073; 42 U.S.C. § 9604. Alternatively, the EPA may bring suit to compel compliance, using the contempt powers of the district court to impose potential sanctions for non-compliance. *Pakootas*, 452 F.3d at 1073; 42 U.S.C. § 9606(a). The EPA may further bring suit seeking to impose fines up to $25,000 for each day the party fails to comply with the order. *Pakootas*, 452 F.3d at 1073; 42 U.S.C. § 9606(b)(1). A PRP who refuses to comply with a cleanup order without sufficient basis may also be liable to the government for punitive damages in an amount equal to three times the cost incurred by the Superfund for the cleanup. 42 U.S.C. § 9607(c)(3). This would prompt recalcitrant PRPs to cooperate and would deter insurance companies from writing policy provisions that slow down the cleanup process.

While Chubb and Chartis contend that the condition precedent under section 112(c) would thwart CERCLA's purpose, the opposite is true. Requiring PRPs to first seek claims from the Superfund or other PRPs, instead of resorting to insurance money, ensures that PRPs are identified and held accountable for cleanups. PRPs are in a better position to locate and identify other PRPs because they are more knowledgeable about the polluting site and engage in the

cleanups themselves, rather than insurance companies who are detached from the property and are not involved in the remediation activities.  This furthers CERCLA's goal of making polluters pay for cleanup costs.  Making polluters pay, in turn, frees up, not reduces, the available insurance money for remediation.  Additionally, requiring the insured to pursue a claim before a subrogation right vests under section 112(c) would not be unduly burdensome or have a slowing effect on cleanups of polluted sites.  Insurance companies may write their policies in a way as to require reasonable cooperation from their insureds.  In the Policy at issue, for example, Taube-Koret already had a duty "to cooperate and otherwise offer [Chubb] reasonable assistance in the defense, investigation or settlement of a claim."

Moreover, not permitting an equitable subrogation action under section 107(a) and requiring the insured to make a claim before an insurer can pursue a section 112(c) claim does not give a "free pass" to actual polluters.  The issue here is not whether *liable* parties or *actual* polluters are given a free pass, but whether insurers may pursue a CERCLA claim under 107(a) and 112(c) without having incurred response costs and without its insured first making a claim. Defendants' liability has not yet been proven.  Nor has Taube-Koret or anyone else other than Chubb ever alleged, let alone proven, that any of the Defendants is a responsible party for the contamination on Taube-Koret's property.  And, as previously noted, actual polluters do not necessarily receive a free pass because insurers may pursue subrogation claims under section 112(c) and state law.

There are further countervailing policy arguments that counsel against an expansive reading of sections 107(a) and 112(c).  Aside from the timely cleanup of polluted sites and

imposing liability on responsible parties, "[o]ne of the core purposes of CERCLA is to foster settlement through its system of incentives and without unnecessarily further complicating already complicated litigation." *City of Chico*, 297 F. Supp. 2d at 1235; *see also In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 119 (2d Cir. 1992) ("Congress sought through CERCLA . . . to encourage settlements that would reduce the inefficient expenditure of public funds on lengthy litigation."); *City of Emeryville*, 621 F.3d at 1264 (noting that CERCLA was designed to ensure, *inter alia*, "that settlements are encouraged through specified contribution protection"); 42 U.S.C. § 9622.  Under section 113(f)(2), "[a] person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement."  42 U.S.C. § 9613(f)(2).  If section 107(a) were interpreted broadly to authorize subrogation actions, an insurer could circumvent this provision for contribution protection by suing settling PRPs for cost recovery, thereby eviscerating the incentive for early settlement and causing a proliferation of cost-recovery suits by insurance companies.

Moreover, enabling insurance companies to sue in subrogation under section 107(a) or section 112(c), irrespective of whether the insurer has incurred response costs or the insured has made a claim, creates perverse incentives. It would encourage insurance companies to sue third parties who may or may not be liable for the release of contaminants in the hopes of getting a settlement from those who would rather settle than engage in expensive litigation.  It could also create a windfall for insurance companies, since they would not only receive premium payments, but also potentially lucrative recoveries from CERCLA actions.

Finally, allowing insurers the benefit of a broad subrogation right under section 107(a) or 112(c) would be fundamentally unfair because while CERCLA does not bar an insurer from recouping insurance payments through subrogation, it prohibits a contractual assignment of liability. *See* 42 U.S.C. § 9607(e)(1) ("No indemnification . . . shall be effective to transfer from the [PRP] . . . to any other person the liability imposed under this section."). Chubb thus would reap the benefits of Taube-Koret's rights without remaining liable under CERCLA for any future violation or continuing remediation. This scheme facilitates the business of insurance companies, rather than ensuring that responsible parties pay for environmental cleanups.

In sum, after reviewing the statutory language, remedial scheme, and purpose of CERCLA, along with relevant case law, we hold that an insured must first make a claim to either the Superfund or a potentially liable party before an insurer can bring a subrogation action under section 112(c). We further hold that section 107(a) of CERCLA does not authorize an insurer to assert a subrogation claim under that provision to recover insurance payments when it did not directly incur environmental response costs. The plain statutory language of section 107(a) and its interaction with section 112(c), which directly speaks to the issue of subrogation, indicate that Congress did not contemplate equitable subrogation under section 107(a). Permitting subrogation suits through an expansive reading of section 107(a) and 112(c) would thwart, not promote, CERCLA's purpose and the interests of public policy.

### B.  Chubb's State Law Claims[13]

Chubb asserts subrogated state law claims under the California Health and Safety Code and under negligence per se and strict liability tort theories.  The district court dismissed Chubb's state law claims as time-barred under section 338(b) of the California Code of Civil Procedure, which provides for a three-year limitations period for "[a]n action for trespass upon or injury to real property."  The statute of limitations for injury to property begins to run when the injury to the property occurs.  *CAMSI IV v. Hunter Tech. Corp.*, 230 Cal. App. 3d 1525, 1534 (1991).  This limitation period applies "regardless of the theory upon which relief is sought."  *Auto. Ins. Co. v. Union Oil Co.*, 85 Cal. App. 2d 302, 307 (1948).  The parties do not contest that section 338(b) applies to Chubb's state law claims.  Rather, the dispute turns on when the limitations period begins, and whether, on the facts alleged in the TAC, the district court properly dismissed Chubb's state law claims.

### 1.  The Accrual Period under Section 338(b)

Chubb challenges the district court's determination that the limitations period under section 338(b) "commences to

---

[13] As a preliminary matter, Chubb's argument that the district court applied an incorrect legal standard in dismissing its state law claims is without merit.  Chubb does not take issue with the Rule 12(b)(6) standard articulated under *Twombly* and *Iqbal*, which the district court applied in dismissing the TAC and Chubb cites in its brief.  The district court concluded that Chubb's state law claims were time-barred under the alleged facts in the TAC.  This decision was based on a proper application of Rule 12(b)(6), and did not involve impermissible findings of fact.

run when the plaintiff knows, or should have known, of the wrongful conduct at issue." *Angeles Chem. Co. v. Spencer & Jones*, 44 Cal. App. 4th 112, 119 (1996).  Because Chubb has not suffered an injury itself, but instead is asserting the claims of Taube-Koret in subrogation, the limitations period began to run when Taube-Koret knew, or should have known, of the wrongful conduct—*i.e.*, the release of hazardous substances on its San Antonio Road properties.  *See Auto. Ins. Co.*, 85 Cal. App. 2d at 305 ("[I]t seems only fair, right, just and equitable that one who is subrogated to the rights and remedies of another should be allowed the same time in which to enforce such rights that the law would have allowed to the person to whose rights and remedies he succeeds."); *Emp'rs Ins. of Wausau v. Granite State Ins. Co.*, 330 F. 3d 1214, 1217 (9th Cir. 2003) ("Because of the derivative nature of subrogation, a subrogee insurer is subject to the same statute of limitations that would have been applicable had the insured brought suit in his or her own behalf." (citation and quotes omitted)).

Chubb contends that the statute of limitations under section 338(b) is measured from the date that an insurer pays an indemnity claim, alleged in this case to be December 4, 2008.  In support of this proposition, Chubb relies on *Smith v. Parks Manor*, 197 Cal. App. 3d 872 (1987) and *Preferred Risk Mutual Insurance Co. v. Reiswig*, 21 Cal. 4th 208 (1999).  But as the district court observed, these cases are inapposite because they deal with third-party subrogation actions, rather than, as here, payments made pursuant to claims by its insured.  In *Parks Manor*, the insurer intervened in a negligence suit filed against its insureds, seeking equitable indemnity against the cross-defendant for the settlement amount it had paid to the plaintiff on the insured's behalf.  197 Cal. App. 3d at 876–77.  The trial court granted

the cross-defendant's demurrer without leave to amend because it determined, in part, that the intervener's action was barred by the statute of limitations. *Id.* at 877. The appellate court affirmed the dismissal under the applicable one-year statute of limitations period for seeking equitable indemnities, which it stated "accrues when the indemnitee suffers a loss through payment of a judgment or settlement debt." *Id.* at 882. In *Preferred Risk*, an insurer paid a $1 million policy limit as settlement to a third party who filed suit against the insured entity for injuries she sustained after her hand was slammed in the insured's van door. 21 Cal. 4th at 212. The injured third party later filed a medical malpractice suit against her treating doctors for subsequent complications to her condition. *Id.* The insurer also filed a complaint in subrogation against the doctors for equitable indemnity. *Id.* The trial court dismissed the complaint under the one-year personal injury statute of limitations, and the court of appeal affirmed. *Id.* at 213. The issue before the California Supreme Court was whether the tolling provision under Cal. Code Civ. Proc. § 364 applied to the insurer's equitable indemnity action. In holding that the tolling provision applied, the court relied, in part, on the rule that "[a] person whose negligence causes injury that a physician's malpractice aggravates may seek equitable indemnity from the physician," and "[t]he equitable indemnity cause of action does not accrue until the person pays the injured third party's claim." *Id.* at 213.

In contrast to both these cases, Chubb does not assert a claim for equitable indemnity arising from a payment it made

to a third party on Taube-Koret's behalf.[14]    Rather, Chubb's state law claims are premised on subrogated claims for the recovery of payment made directly to Taube-Koret. Thus, the rule articulated in *Parks Manor* and *Preferred Risk* is inapplicable here and does not support Chubb's position that the limitations period under section 338(b) began at the time it indemnified Taube-Koret.    The district court correctly determined that the statute of limitations period under section 338 accrues "when the plaintiff knows, or should have known, of the wrongful conduct at issue." *Angeles Chem. Co.*, 44 Cal. App. 4th at 119.

Nevertheless, Chubb insists that its suit is a third-party subrogation action, and that it issued Taube-Koret a third-party liability policy, rather than a first-party loss policy. While Chubb is correct that the Policy includes third-party liability coverage, it also provides for first-party loss, which is the provision at issue in this case. (*See* Policy, Sect. 1.1 ("We will also pay remediation costs resulting from discovery of a pollution incident . . . on or under the insured site. . . .").)    As alleged in the TAC, Chubb reimbursed Taube-Koret for expenses it incurred in cleaning up the contaminated soil on its property, not a settlement to a third-party for Chubb's tortious conduct. Nor did the Water Board issue a "claim" for loss caused by Taube-Koret, but rather, issued a cleanup order to Taube-Koret. Thus, the district court correctly determined that the limitations period began to run at the time Taube-Koret knew or should have known of

---

[14] Chubb originally brought a claim for equitable indemnity, which the district court dismissed with *leave to amend*.  Because Chubb did not voluntarily renew these claims, however, it effectively abandoned them. *See Lacey*, 693 F.3d at 928 ("[F]or any claims voluntarily dismissed, we will consider those claims to be waived if not repled.").

the pollution on its property, not when Chubb reimbursed Taube-Koret for its response costs.

## 2.  San Antonio Road Properties

Dismissal of Chubb's state law claims on the ground that it is barred by section 338(b) is proper only when "the running of the statute is apparent on the face of the complaint." *Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 997 (9th Cir. 2006) (citation and quotes omitted).  Based on the allegations in the TAC, the district court properly determined that Chubb's state law claims were time-barred.

Chubb alleges in the TAC that, on August 12, 2003, the Water Board issued Order No. R2-2003-0071, naming Taube-Koret as a discharger of hazardous substances found on 901 San Antonio Road, and that Taube-Koret removed contaminated soil from that site in June and July 2006. Construing these facts in the light most favorable to Chubb, it is reasonable to infer that Taube-Koret knew or should have known of hazardous substances on its property as early as August 2003 and as late as July 2006, when it removed the contaminated soil.  There are no allegations that any other environmental response actions occurred.  Since Chubb did not file suit until September 23, 2009, more than three years after the removal date, its state law claims are time-barred as to 901 San Antonio Road.

With respect to 851 San Antonio Road, Chubb alleges that it acquired the property in November 2006 for inclusion in its redevelopment project.  While it may be inferred from this purchase date that Chubb did not know about the contamination until November 2006 (thus within the limitations period), the Policy suggests otherwise.  Under the

Policy, which was incorporated in the TAC and all prior complaints, there is an endorsement, dated December 28, 2004, which expressly identifies a "pollution incident" at the 851 San Antonio Road property that was excluded from coverage. The description of the pollution incident references underground storage tanks and product lines at the property, as stated in an environmental site assessment dated September 13, 2004. It is reasonable to infer that Taube-Koret knew or should have known of at least some of the contamination on 851 San Antonio Road in late 2004. Thus, Chubb's claims as to this property are also time-barred.

Chubb, however, argues that dismissal was improper because the running date of the statute of limitations period depends on whether the injury was permanent or continuous, which the district court failed to evaluate. Chubb insists that the TAC included allegations of "continuous physical injury" that was finally remediated in 2008, and under California law, the statute of limitations on continuous physical injury does not begin to run until abatement of the injury. Chubb is mistaken. California does not recognize a claim for continuing negligence per se or continuing strict liability. *See Mangini v. Aerojet-Gen. Corp.*, 230 Cal. App. 3d 1125, 1149 (1991) (permitting amendment of complaint to allege continuing trespass and nuisance, but finding claims for negligence per se and strict liability time-barred), *superseded by statute on other grounds as stated in Makreas v. First Nat. Bank of N. Cal.*, 856 F. Supp. 2d 1097, 1102 n.3 (N.D. Cal. 2012).[15] Thus, allegations of continuing injury is immaterial

---

[15] Ford acknowledges that for certain common law torts, such as nuisance and trespass, the running time of the limitations period depends on whether the conditions giving rise to the injury are permanent or continuous. *See McCoy v. Gustafson*, 180 Cal. App. 4th 56, 63, 84

to Chubb's asserted claims, and later discovery of hazardous substances does not extend the limitations period. Nor does the change of ownership prolong the statute of limitations because the injury is assessed vis-à-vis the property, not the property owner. *Beck Dev. Co. v. S. Pac. Transp. Co.*, 44 Cal. App. 4th 1160, 1216 (1996) ("[T]he statute of limitations does not commence to run anew every time the ownership of the property changes hands."). Finally, Chubb does not rely on California's Discovery Rule to toll the statute of limitations, as it did not plead the requisite facts showing "(1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence." *CAMSI IV*, 230 Cal. App. 3d at 1536. The district court properly dismissed Chubb's state law claims as time-barred.[16]

## CONCLUSION

Our decision here does not mean that insurers cannot bring subrogation claims in environmental matters. On the contrary, insurers' subrogation rights remain intact under CERCLA section 112(c) and relevant state law provisions. The right to subrogation under CERLCA section 112(c), however, is not an unbridled right. It may be circumscribed

---

(2009). While Chubb asserted claims for nuisance and trespass in its First Amended Complaint, they were dismissed by the district court with leave to amend. Chubb did not renew those claims in the TAC, thereby waiving them. *See Lacey*, 693 F.3d at 928.

[16] Because we conclude that Chubb's state law claims were properly dismissed, we decline to reach the remaining issues raised by Chubb, of whether it sufficiently alleged that Ford Motor is an "owner" or "operator" of the Ford Aerospace "facility" under section 107(a), and whether it pleaded sufficient allegations that Chevron or Stevenson is responsible for a "release" of a hazardous substance.

by Congress through certain requirements, including the assertion of a claim by the subrogor-insured. Moreover, the common law principle of subrogation does not apply to section 107(a) because there is clear congressional intent to the contrary, as evinced by the language of section 107(a), its statutory scheme in relation to section 112(c), and CERCLA's overall purpose. Although CERCLA should be liberally construed to effectuate the purpose of the statute, it may not be extended so far as to fashion a new right under CERCLA that Congress did not intend. Nor, *a fortiori*, should a right be created by application of a common law principle that not only contravenes the express language and scheme of CERCLA, but also does not further its aims. CERCLA was not enacted to benefit insurance companies; rather, it was enacted to promote the timely cleanup of contaminated waste sites, impose liability on those responsible for polluting the environment, and to encourage settlement through a complex statutory scheme. An expansive application of subrogation to sections 107(a) and 112(c) is inconsonant with those overall goals. If Congress wishes to change CERCLA's statutory scheme, it may certainly do so. But it is not the province of the courts to rewrite the statute. CERCLA sets limits and provides express guidance by which a party must abide. The statute of limitations under state law also required Chubb to file suit in a timely manner if it desired relief under state law. Chubb failed to do so here. We thus affirm the district court.

**AFFIRMED.**

GOULD, Circuit Judge, dissenting:

I respectfully dissent.  The majority provides a reasoned explication of why statutory subrogation under section 112(c), 42 U.S.C. § 9612(c), does not apply.  But the majority's analysis of section 107(a), 42 U.S.C. § 9607(a), does not honor Chubb's right to equitable subrogation, which allows Chubb to stand in the shoes of Taube-Koret.

"Equitable subrogation is a broad equitable remedy," *Mort v. United States*, 86 F.3d 890, 894 (9th Cir. 1996), that for centuries has been recognized by courts.  *See generally* M.L. Marasinghe, *An Historical Introduction to the Doctrine of Subrogation: The Early History of the Doctrine II*, 10 Val. U. L. Rev. 275 (1976).  It "arose as a 'creature of equity' and 'is enforced solely for the purpose of accomplishing the ends of substantial justice.'" *Hamada v. Far E. Nat'l Bank* (*In re Hamada*), 291 F.3d 645, 649 (9th Cir. 2002) (quoting *Memphis & L.R.R. Co. v. Dow*, 120 U.S. 287, 302 (1887)).  A good explanation of the equitable right of subrogation can be found in Dobbs's treatise on the *Law of Remedies*:

> Subrogation simply means substitution of one person for another; that is, one person is allowed to stand in the shoes of another and assert that person's rights against the defendant.  Factually, the case arises because, for some justifiable reason, the subrogation plaintiff has paid a debt owed by the defendant.  Having paid the defendant's creditor, the plaintiff stands in the creditor's shoes, becomes the real party in interest, and is entitled to exercise all the remedies which the creditor possessed against the defendant.

1 Dan B. Dobbs, *Law of Remedies: Damages-Equity-Restitution* § 4.3(4), at 604 (West Publishing 2d ed. 1993) (quotations and footnotes omitted).  Applying this "well-settled rule" of equitable subrogation, I would hold that we should recognize the right of an insurer to equitable subrogation once it has reimbursed a landowner for remediation expenses that in fairness should have been borne in part by others. *See United States v. Bestfoods*, 524 U.S. 51, 63 (1998) (applying a "well-settled rule" of corporate common law in the CERCLA context); *see also Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant, Inc.*, 159 F.3d 358, 362–63 (9th Cir. 1998) (applying "traditional rules" of successor liability under CERCLA).

Taube-Koret paid cleanup expenses that should have been borne in part by Ford, Chevron, Sun Microsystems, Inc., and others who polluted and contaminated the property.  The majority reasons that because Chubb reimbursed Taube-Koret's cleanup expenses and did not directly incur those costs, it does not meet the definition of "any person" under section 107(a).  42 U.S.C. § 9607(a).  But the regime of law mandated by the majority is contrary to CERCLA's intent to make polluters pay.  *See Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009) (stating that CERCLA was "designed . . . to ensure that the cost of such cleanup efforts were borne by those responsible for contamination").  Here, Chubb is left with the bill while the polluters pay nothing.

It should not matter that the statutory subrogation remedy elements are not satisfied under section 112(c).  There is no showing that Congress intended this type of subrogation to be exclusive—no showing that Congress intended to eliminate consideration of equitable subrogation.  *See Bestfoods*,

524 U.S. at 63 (explaining that a federal statute does not "abrogate a common-law principle" unless it "speak[s] directly to the question addressed by the common law" (quoting *United States v. Texas*, 507 U.S. 529, 534 (1993)). Indeed, if Congress spoke to the issue at all it was to maintain this common law right.  *See* 42 U.S.C. § 9607(e)(2) (stating that "[n]othing in this subchapter . . . shall bar a cause of action that an owner or operator or any other person subject to liability under this section, or a guarantor, has or would have, by reason of subrogation").  At most the statute is ambiguous, and it is within the power of our court to give it a sensible construction in light of CERCLA's purpose.[1]

The district court and the majority give credence to the argument that permitting a subrogation claim under section 107(a) renders section 112(c) a nullity, but I disagree.  In *United States v. Atlantic Research Corporation*, the Supreme Court recognized that CERCLA allows for complementary remedies that provide causes of action "to persons in different procedural circumstances."   551 U.S. 128, 139 (2007). Sections 112(c) and 107(a) provide for such complementary remedies.  Allowing a subrogation claim under section 107(a) gives Chubb a remedy where one is otherwise not permitted

---

[1] It is true, as the majority notes, that *Bestfoods* and *Atchison* adopted well-settled common law in areas where CERCLA was silent on the issue. *See Bestfoods*, 524 U.S. at 62–63, *Atchison*, 159 F.3d at 363.  And it is true that CERCLA's silence is dispositive on Congress's intent to adopt well-established common-law principles.  *See Bestfoods*, 524 U.S. at 70. But it does not plainly follow, especially in light of the statute's ambiguous language, that CERCLA's discussion of subrogation under section 112(c) is evidence of a contrary intent sufficient to overcome the "lenient presumption" that Congress "legislate[s] against a background of common-law . . . principles."  *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108, 112 (1991).

under section 112(c) and where subrogation serves the purposes of CERCLA. If Taube-Koret had made explicit claims against Ford, Chevron, and Sun Microsystems, Inc., and Chubb had then reimbursed a "claimant," there would be no question that Chubb would be entitled to proceed under section 112(c). But where an insurance company reimburses an insured party that incurred cleanup costs but has not asserted claims against potentially responsible parties, in my view, the proper remedy is under section 107(a). To deny this is detrimental to CERCLA. It is the actions of the insured, and not the insurer, that determine the procedural circumstances of the subrogation claim and dictate the proper statutory remedy. *See Atl. Research*, 551 U.S. at 139. That there is some overlap between these two remedies is not fatal. *See id*. at 139 n.6. In either event, there should be a subrogation remedy available to an insurance company that has paid for a cleanup by reimbursing its insured.

The scheme of law adopted by the majority may be able to decide this particular case by characterizing the actions of the insurer's legal counsel as too little and too late. This view is inaccurate and reflects the majority's failure to implement a fair procedure of subrogation in a way that is called for under section 107(a). Also, in the long run, one cannot expect insurers to indemnify companies for pollution cleanup costs without charging an insurance premium reflecting the risk of monetary loss and that risk will necessarily increase if the insurer cannot seek contribution from prior polluters and property owners. Either insurance premiums for an organization like Taube-Koret will go up dramatically, raising questions on feasibility of insurance, or the policies will condition payment on a prior claim by the insured against other contributors to the pollution. This will discourage or delay cleanups, putting public health and safety at risk and

undermining the purpose of CERCLA.  *See Burlington N. & Santa Fe Ry. Co.*, 556 U.S. at 602 (explaining that CERCLA was "designed to promote timely cleanup of hazardous waste sites" (quotations omitted)).  So the majority's ruling here will have the unfortunate and predictable impact of impeding cleanup efforts that benefit the public.[2]

---

[2] Congress can rectify this result for future cases by modifying their statutory language in a way that would satisfy the majority.  But for practical reasons, we cannot assume that corrective legislative action will promptly arrive.  As Sir Frederick Pollock explained long ago, though in a different context, "legislative methods and procedure being what they are and must be, it is for the most part idle to count on legislation for this [corrective] purpose."  Sir Frederick Pollock, *A First Book of Jurisprudence: For Students of the Common Law* 310 (Burt Franklin 1970).  If the statutory language really commanded the position taken by the majority, I would of course abide it.  But in my view, the ambiguous statutory language permits a more sensible result than that taken by the majority.